**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| RELINE AMERICA, LLC, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHRISTIAN NOLL, *et al.*, <br><br> *Defendants* | Civil Action No. <br> 8:23-cv-435-ABA |
| RELINE MANAGEMENT CORPORATION, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> RELINE HOLDINGS, LLC, *et al.*, <br><br> *Defendants* | Civil Action No. <br> 8:24-cv-030-ABA |

**MEMORANDUM OPINION**

Sewer pipes can degrade over time, and one technology for extending their life is to install liners. One such pipe-relining technology uses ultraviolet lights to "cure" the liners—to harden them in place. The industry refers to these as ultraviolet cured-in-place-pipe ("UV CIPP") systems. This case arises out of a dispute between various Maryland-based and Germany-based businesses in or around the UV CIPP industry.

On January 7, 2019, Reline Holdings, LLC ("Reline Holdings") and Reline Management Corporation ("Reline Management") signed various agreements to become the two members of Reline America, LLC ("Reline America"). Reline Management is wholly owned by RelineEurope GmbH ("RelineEurope"), a German-based company. In November 2019, Pipe Holdings GmbH ("Pipe Holdings") and possibly Bregal

1

Unternehmerkapital GmbH ("Bregal"), two German-based companies, purchased all the interests in RelineEurope and effectively took over Reline Management. From this sale stemmed various claims from each side alleging breaches of contract, breaches of fiduciary duties, fraud, and more. On February 17, 2023, Reline America, Reline Holdings, Sugarloaf Financial Group, LLC ("Sugarloaf"), Year 2003 Trust for Descendants ("Year 2003 Trust"), and William D. Pleasants Jr. (collectively, "*Reline 1* Plaintiffs") filed Case No. 23-cv-435 against Christian Noll, Bernd Flossmann, Ludwig Allmann, SML Verwaltungs-GmbH ("SML"), Reline Management, RelineEurope, Reline APTEC GmbH ("APTEC"), Bregal, Pipe Holdings, and Anke Masek (Case No. 23-cv-435, hereinafter referred to as "*Reline 1*"). On January 5, 2024, Reline Management and RelineEurope (collectively, the "*Reline 2* Plaintiffs") filed Case No. 24-cv-030 against Reline Holdings, Reline America, Pleasants Enterprises, Inc. ("Pleasants Enterprises"), Pleasants Companies, LLC ("Pleasants Companies"), and Pleasants (collectively, the "*Reline 2* Defendants") (Case No. 24-cv-030, hereinafter referred to as "*Reline 2*"). The defendants in each case have filed motions to dismiss. For the reasons that follow, those motions will be granted in part and denied in part.

## Table of Contents

I.   BACKGROUND ................................................................................................................4

    A.  The trans-Atlantic joint venture .........................................................................4

    B.  The sale to Pipe Holdings....................................................................................7

    C.  After the sale........................................................................................................9

    D.  The claims ......................................................................................................... 12

        1.  The *Reline 1* claims .................................................................................... 12

        2.  The *Reline 2* claims.................................................................................... 13

II.  STANDARD OF REVIEW ............................................................................................ 14

    A.  Personal Jurisdiction under Rule 12(b)(2)........................................................ 14

B.  Failure to State a Claim under Rule 12(b)(6) ............................................................ 15

III.  DISCUSSION..................................................................................................................... 16

A.  *Reline 1* ............................................................................................................................ 16

1.  Personal Jurisdiction............................................................................................ 16

a)  Bregal and Pipe Holdings ......................................................................... 18

b)  Noll, Flossmann, and Allmann ................................................................ 21

c)  Anke Masek ................................................................................................23

2.  Statute of Limitations ..........................................................................................25

a)  Noll, Flossmann, and Allmann ...............................................................26

b)  Masek .........................................................................................................27

3.  Failure to State a Claim .......................................................................................29

a)  Breach of Contract Claims (Counts I and II)............................................29

b)  Breach of Fiduciary Duties (Count III).....................................................45

c)  Fraud (Count IV)........................................................................................ 51

d)  Civil Conspiracy (Count V) ......................................................................62

B.  *Reline 2* .........................................................................................................................65

1.  Whether the claims in *Reline 2* constitute compulsory counterclaims with respect to *Reline 1* ...............................................................................................65

a)  Rule 13(a) ...................................................................................................66

b)  Rule 13(b) ...................................................................................................69

2.  Failure to State a Claim .......................................................................................70

a)  Breach of Contract Claims (Counts I–III)................................................70

b)  Breach of Fiduciary Duties (Count VI) .....................................................76

c)  Fraudulent Concealment (Count VII) ....................................................... 77

d)  Unfair Competition (Count VIII)..............................................................80

C.  Dismissals.....................................................................................................................82

IV.  CONCLUSION.....................................................................................................................83

## I.    BACKGROUND[1]

### A.    The trans-Atlantic joint venture

On April 20, 2005, Pleasants and Mike Burkhard founded Reline America, Inc., a Maryland corporation, to enter the UV CIPP business. *Reline 2*, ECF No. 1 ¶¶ 26–27. In or around 2005, Reline America, Inc. entered into a ten-year licensing deal with Bradenburger Liner GmbH&Co.KG ("Bradenburger"), a German-based company that manufactured a type of UV CIPP liner. *Id.* ¶ 28. At that time, UV CIPP was not frequently used in North and South America (the "American Markets") but was prevalent in European markets. *Id.* Noll and Allmann were the managing directors of Bradenburger at the time and were the primary points of contact for the relationship with Reline America, Inc. *Id.* ¶ 29.

In or around 2008 or 2009, Noll and Allmann left Bradenburger to start RelineEurope, at which point Reline America, Inc. began developing its own marketing strategy for UV CIPP technology in North America. *Id.* ¶ 30. In or around 2012, other German manufacturers began to sell UV CIPP products to installers and customers in North American markets. *Id.* ¶¶ 33–36. Once Reline America Inc.'s licensing agreement with Bradenburger expired, Noll reached out to Pleasants about pursuing a joint venture with RelineEurope, which Pleasants initially refused. *Id.* ¶ 37. RelineEurope began its own marketing efforts in the American Markets. *Id.* ¶ 38. According to *Reline 2*

---

[1] At the pleadings stage, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). While two of the defendants in *Reline 1* are the plaintiffs in *Reline 2*, the parties generally agree on the facts that appear in the complaints to both cases and the Court will include both citations for these; some of the facts, however, appear only in one complaint.

Plaintiffs (based on their information and belief), Noll instructed major suppliers not to supply Reline America, Inc. with certain raw materials and planned to create a new United States-based entity affiliated with RelineEurope to compete directly with Reline America, Inc. *Id*. Pleasants then agreed to pursue a joint venue but demanded certain conditions, including: Reline America, Inc. would become an LLC; Reline Holdings and RelineEurope would each have 50% equity interests, but Reline Holdings would retain a 75% voting interest; RelineEurope would license and transfer its pressure liner business in the United States to Reline America such that Reline America would have the exclusive rights of sale in the American Markets; and RelineEurope would then have the right to ultimately determine the purchase price for a global sale of Reline America after five years. *Id*. ¶ 39.

On February 20, 2018, Noll traveled to Maryland to meet Pleasants and commence negotiations regarding the formation of the joint venture. *Reline 1*, ECF No. 73 ¶ 29. Noll, Flossmann, and Allmann, who all reside in Germany, made numerous visits to the United States, including Maryland, to negotiate the agreements. *Id*. ¶¶ 12–14, 35. *Reline 1* Plaintiffs allege that German laws prevented any German person or entity to be parties to the agreements; so, RelineEurope formed Reline Management as a United States corporation to hold its membership interest in Reline America. *Id*. ¶ 36. On January 7, 2019, six agreements were executed relating to the formation of Reline America: the Membership Purchase Agreement, Cooperation Agreement, Operating Agreement, Undertaking Agreement, Reline Management Note, and Collateral Agreement (collectively, the "Definitive Agreements"). *Id*. ¶¶ 31, 32; *Reline 2*, ECF No. 1 ¶ 41.

The **Membership Purchase Agreement** was signed by Pleasants as the President of Reline Holdings and Noll as the President of Reline Management and provided that Reline Management acquired 50% membership interest and 25% voting interest in Reline America for $4 million. *Reline 1*, ECF No. 73 ¶ 33(a). The **Cooperation Agreement** was signed by Pleasants as President of Reline Holdings and Pleasants Enterprises and Noll as President of Reline Management. It included various provision regarding how RelineEurope, Reline Management, Reline Holdings, and Reline America were to cooperate with one another through the joint venture. *Id*. ¶ 33(b). The **Operating Agreement** was signed by Pleasants as President of Reline Holdings and Noll and President of Reline Management and laid out the agreement for operating the newly formed LLC. *Id*. ¶ 33(c). The **Undertaking Agreement** was signed by Pleasants as President of Reline Holdings and Pleasant Enterprises, Noll as member of the board of RelineEurope, managing director of APTEC, and as an individual, Flossmann as managing director of SML and as an individual, and Allmann as an individual. *Id*. ¶ 33(d).[2] The **Reline Management Note** was signed by Noll as President of Reline Management; under the Note, the Year 2003 Trust financed Reline Management's purchase of membership interest in Reline America. *Id*. ¶ 33(e). Finally, the **Collateral Assignment Agreement** was signed by Noll as President of Reline Management and provided that Reline Management secured the $4 million acquisition loan made by Year 2003 Trust. *Id*. ¶ 33(f).

---

[2] Although *Reline 1* Plaintiffs contend that Allmann was a signatory of the Undertaking Agreement, *Reline 1*, ECF No. 73 ¶ 33(d), one copy of the Undertaking Agreement on the record includes a signature line for Allman but does not include Allmann's signature, *Reline 1*, ECF No. 79-4 at 11, and another contains a signature but without a date or corresponding witness signature, *Reline 1*, ECF No. 79-4 at 12.

### B.    The sale to Pipe Holdings

Pleasants alleges that he agreed to the joint venture and structure of the transaction based on his understanding and the allegedly express agreement that Noll, Flossmann, and Allmann would not only remain the controlling members of Reline Management, RelineEurope, APTEC, and SML, but also would remain personally involved in their operation and management as well as that of Reline America. *Id*. ¶¶ 37–38. Pleasants alleges that he expressly told Noll, Flossmann, and Allmann that he would not enter into the joint venture with them unless they were personally involved in the businesses. *Id*. ¶ 39. Pleasants alleges that at the time of the formation of the joint venture, Masek, Allmann's daughter, owned a 4.55% interest in RelineEurope, which Noll, Flossmann, and Allmann failed to disclose. *Id*. ¶¶ 50, 67–68.

Pleasants contends that when he negotiated these agreements, he considered all the parties to be committed to a future in which they would be working together. As explained below, Noll, Flossmann, and Allmann ended up deciding to part ways with RelineEurope, and sold their business to another German company, Pipe Holdings (for €130 million). *Id*. ¶ 91. But Pleasants and his fellow *Reline 1* Plaintiffs contend that Noll, Flossmann, and Allmann not only ended up going their own way business-wise, but never had any intention to build a business together and thus duped them from the beginning. *Id*. ¶¶ 77, 81. *Reline 1* Plaintiffs allege that, as early as 2017—prior to the formation of Reline America—Noll, Flossmann, Allmann, and Masek were actively planning and negotiating the sale of their interest in RelineEurope, Reline Management, and APTEC (collectively, the "Reline Europe Defendants") and did not disclose that information to Pleasants. *Id*. ¶¶ 66, 76. And *Reline 1* Plaintiffs contend that those parties had a duty to disclose that information based on the contention that Noll, Flossmann,

Allmann, SML, and Reline Europe Defendants owed *Reline 1* Plaintiffs fiduciary duties and contractual duties. *Id*. ¶¶ 220–225, 237, 243.

Reline Management and RelineEurope allege that RelineEurope's shareholders did not begin negotiating a sale of their shares of RelineEurope until April or May 2019. *Reline 2*, ECF No. 1 ¶ 63. *Reline 1* Plaintiffs allege that Bregal and Pipe Holdings approached RelineEurope, offering €100 million around July 2019 to purchase all shares of RelineEurope. *Reline 1*, ECF No. 73 ¶ 84. Pipe Holdings may not have been initially aware of the Reline America joint venture but became aware of Reline Management's membership interest in it during the process of negotiating the sale. *Id*. ¶¶ 85, 87; *Reline 2*, ECF No. 1 ¶ 64. The *Reline 1* Plaintiffs contend that when Pipe Holdings mentioned to RelineEurope an interest in contacting Pleasants regarding the sale, RelineEurope informed Pipe Holdings that they were conducting a competitive bidding process for the sale and therefore requested that they refrain from contacting Pleasants or Reline America directly; Pipe Holdings complied and did not contact Pleasants or Reline America. *Reline 2*, ECF No. 1 ¶ 64; *Reline 1*, ECF No. 73, ¶¶ 93–94. In November 2019, Noll, Flossmann, Allmann, and Masek, using SML as a holding company, sold their shares in RelineEurope to Pipe Holdings for €130 million. *Reline 2*, ECF No. 1 ¶ 65; *Reline 1*, ECF No. 73 ¶ 89.[3] *Reline 1* Plaintiffs allege that they "did not learn about the sale until months later" and that "it was not until March 2021 that Pleasants and the Plaintiffs became aware that [Bregal and Pipe Holdings] had acquired *all* of the interests in the [RelineEurope, Reline Management, and APTEC], and that

---

[3] *Reline 1* Plaintiffs allege that the shares were sold to both Bregal and Pipe Holdings. *Reline 1*, ECF No. 73 ¶ 89.

Noll, Flossmann, and Allmann were not involved or invested in the joint venture or [RelineEurope, Reline Management, and APTEC]." *Reline 1*, ECF No. 73 ¶ 95 (emphasis in original).

### C.    After the sale

*Reline 2* Plaintiffs allege that after the sale of RelineEurope and its affiliates to Pipe Holdings, Reline Holdings refused to cooperate with them by "blocking any and all attempts to grow the [Reline America]'s business in the Americas, failing to respond to books and records requests, refusing to allow Reline Europe and Reline Management to conduct an audit of Reline America's financial records, and making certain Major Decisions, as defined by the Operating Agreement, without the knowledge—much less the consent—of Reline Management." *Reline 2*, ECF No. 1 ¶ 66. Specifically, *Reline 2* Plaintiffs allege that Pleasants refused to work with Frank Mersmann, the new CEO of RelineEurope, including "when Mersmann offered to attend a trade show in the United States, Pleasants responded that he would not allow anyone from Germany to join the trade show or exhibitions in the Americas." *Id.* ¶ 69.

*Reline 2* Plaintiffs allege that Reline Holdings refused to follow up on leads of potential customers in the American Markets that had reached out to RelineEurope and were directed to Reline America. *Id.* ¶¶ 70–73. For example, they allege that, on February 9, 2021, Mersmann copied Mark Yanzo, Vice President of Reline America, on an email from a potential customer in Ontario, Canada for a "large diameter project," on February 10, 2021; Mersmann emailed Yanzo another lead in Canada for 100% styrene-free liner products; and, on February 19, 2021, RelineEurope passed along information to Yanzo about another potential customer in Toronto, Canada. *Id.* On August 12, 2021, "Mersmann received an email from Pleasants stating that Reline Europe could not

engage in any sales activity in the America[s] absent an express agreement from Reline Holdings that it was permitted to do so." *Id.* ¶ 75. *Reline 2* Plaintiffs also allege that Reline Holdings refused to accept or consider reputable and qualified candidates recommended by RelineEurope. *Id.* ¶ 74.

*Reline 2* Plaintiffs allege that the defendants refused to provide Reline Management with financial information about Reline America to which it was entitled. *Id.* ¶ 83. Specifically, they allege that on June 17, 2021, Christopher Atwell, Vice President of Pleasants Corporation[4], unilaterally ceased providing Reline Management with weekly financial reports, explaining only that the Operating Agreement did not require them, and on August 13, 2021, Atwell refused to have monthly financial calls with Reline Management going forward. *Id.* ¶ 84. Around this time, Relina America's financial performance began to decline steeply despite the growing strength of the UV CIPP market in the United States. *Id.* ¶¶ 77–78. Accordingly, on January 24, 2023, "Reline Management, through counsel, sent a formal request for access to Reline America's books and records." *Id.* ¶ 86. On February 3, 2023, Reline America provided a written response, objecting to two of the requests as being overly burdensome, vague and beyond the scope of what the joint venture is required to maintain. *Id.* ¶ 87. At some point later, Reline America provided a preliminary production of documents that *Reline 2* Plaintiffs contend was incomplete, in that a number of categories of documents that

---

4 Both the *Reline 2* Complaint and motion to dismiss refer to Atwell as the Vice President of Pleasants Corporation. That entity is not otherwise mentioned in the *Reline 1* or *Reline 2* pleadings. It is unclear to the Court whether this was intended to refer to Pleasants Companies (a defendant in *Reline 2*) or if there is an additional company owned by Pleasants that is connected to the lawsuit through Atwell. As this does not affect the outcome of the Court's analysis, Atwell's role is mentioned as it is pleaded.

were requested were not produced. *Id.* On May 16, 2023, counsel for Reline Management sent Reline America a second demand letter, stating that the preliminary production was inadequate and requesting responsive materials. *Id.* ¶ 88. After receiving no response from Reline America, counsel for Reline Management followed up again on May 24, June 1, June 6, and June 13 but contend that Reline America and Reline Holdings did not respond substantively to those emails. *Id.* ¶ 89. On June 26, counsel for Reline Holdings agreed to produce the documents no later than June 29, 2023; however, no documents were produced that day. *Id.* On November 20, 2023, Reline Holdings produced more documents to Reline Management, but *Reline 2* Plaintiffs contend that this production was still inadequate. *Id.* ¶ 90.

*Reline 2* Plaintiffs allege that Reline Holdings intentionally hid and failed to obtain Reline Management's approval for Management Fees incurred between 2020 and 2023. *Id.* ¶ 81. Specially, they allege that Reline America incurred $539,988.63 in "Management Fees" in 2020, $622,258.88 in 2021, and $535,631.17 in 2022—but that none of these amounts were included in approved annual budgets or financial reports. *Id.* ¶ 82. Reline Management contends it was unaware of these payments until May 16, 2023, "when Reline Management analyzed the hidden rows in spreadsheets that contained more than 600 rows that Reline America had provided." *Id. Reline 2* Plaintiffs contend that the November 20, 2023, production of financial documents included invoices for "Monthly Management Fees for Shared Service Expenses," which showed that Reline America had made payments to Pleasants Companies every month from June 2023 through October 2023 for approximately $45,000 per month, which had not been approved by Reline Management. *Id.* ¶ 91.

### D.   The claims

Then came these two cases. The Americans filed first, in February 2023. Hence, "*Reline 1*." RelineEurope and Reline Management filed their case (*Reline 2*) in January 2024. The cases were stayed for a while; the Mediation Provisions of the Cooperation and Undertaking Agreements required that, in disputes arising out of the Definitive Agreements, the parties must first attempt to resolve the disputes through mediation before proceeding to litigation. *See Reline 1*, ECF No. 55 at 5, 11; *Reline 2*, ECF No. 29. The case did not settle, and so the parties have recommenced litigation. All parties have filed motions to dismiss all the claims that have been asserted against them.

### 1.   The *Reline 1* claims

*Reline 1* Plaintiffs contend that when Noll, Flossmann, Allmann, and Masek sold their membership interests to Pipe Holdings, and took the steps that led to that sale, they breached various duties that they owed to the Reline America parties. They have asserted the following claims, as set forth in the Third Amended Complaint (*Reline 1*, ECF No. 73), which is the operative complaint:

| *Reline 1* Claims | Defendants |
|---|---|
| Count I: Breach of Contract (Global Sale and Non-Assignment Provisions) | Reline Management, RelineEurope, APTEC, SML, Noll, Flossmann, and Allmann |
| Count II: Breach of Contract Express Provisions | Reline Management, RelineEurope, APTEC, SML, Noll, Flossmann, and Allmann |
| Count III: Breach of Fiduciary Duty | Reline Management, RelineEurope, APTEC, SML, Noll, Flossmann, and Allmann |
| Count IV: Fraud | Reline Management, RelineEurope, APTEC, SML, Noll, Flossmann, and Allmann |
| Count V: Civil Conspiracy | Reline Management, RelineEurope, APTEC, SML, Noll, Flossmann, and Allmann, Masek, Bregal, and Pipe Holdings |
| Count VI: Tortious Interference with Contractual Relations | Bregal and Pipe Holdings |
| Count VII: Tortious Interference with Prospective Advantage | Bregal and Pipe Holdings |

The *Reline 1* defendants have moved to dismiss all those claims, contending (1) this Court lacks personal jurisdiction over any of those defendants other than Reline Management and RelineEurope; (2) the statute of limitations bars the claims against some of those defendants; and (3) none of those counts state claims on which relief can be granted. *Reline 1*, ECF Nos. 79, 80-1, 89-1.

### 2.   The *Reline 2* claims

Two of the defendants in *Reline 1*—the two that do not contest personal jurisdiction in *Reline 1* (Reline Management and RelineEurope)—have filed their own case: *Reline 2*. They have sued Mr. Pleasants along with four companies that he controls (Reline Holdings, Reline America, Pleasants Enterprises, and Pleasants Companies).

Based on their concerns regarding actions following the sale of RelineEurope, Reline Management and Reline Europe have asserted the following claims in *Reline 2*:[5]

| Claim[6] | Defendants |
|---|---|
| Count I: Breach of Contract (Management Fees) | Reline Holdings |
| Count II: Breach of Contract (Lawsuit) | Reline Holdings |
| Count III: Breach of Contract (Financials) | Reline Holdings and Reline America |
| Count VI: Breach of Fiduciary Duties to Members | Reline Holdings |
| Count VII: Fraudulent Concealment | Reline Holdings, Reline America, Pleasants Enterprises, Pleasants Companies, and Pleasants |
| Count VIII: Unfair Competition | Reline Holdings, Reline America, Pleasants Enterprises, Pleasants Companies, and Pleasants |

## II.    STANDARD OF REVIEW

### A.    Personal Jurisdiction under Rule 12(b)(2)

A motion to dismiss based on a lack of personal jurisdiction "raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Id.* (citing *Combs*, 886 F.2d at 676). "The

---

[5] *Reline 2* initially included Count IV and V for Breach of Covenant of Good Faith and Fair Dealing in the Operating Agreement and License Agreement. *Reline 2*, ECF No. 1 at 36–37. *Reline 2* Plaintiffs subsequently withdrew these claims; so, the Court will not analyze arguments related to these claims. *Reline 2*, ECF No. 20-1 at 33 n.14.

[6] All counts except Count VI are asserted by both Reline Management and Reline Europe. Count VI, for breach of fiduciary duty, is asserted by Reline Management only.

plaintiff must establish personal jurisdiction by a preponderance of the evidence but need only make a prima facie showing." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Combs*, 886 F.2d at 676).

"If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs*, 886 F.2d at 676. In its discretion, a court may permit discovery as to the jurisdictional issue. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). However, neither discovery nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2). *See* 4A Wright & A. Miller, Federal Practice & Procedure § 1351 (4d ed. 2019). "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, . . . the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019) (citing *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196–97 (4th Cir. 2018)). "Unlike under Rule 12(b)(6), the court may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Id.* (citing *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014)).

### B. Failure to State a Claim under Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which

relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P.

12(b)(6). At the pleadings stage, the Court "must accept as true all of the factual

allegations contained in the complaint and draw all reasonable inferences in favor of the

plaintiff." *King*, 825 F.3d at 212.

To withstand a motion to dismiss, a complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative relief" by containing "enough facts

to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although a court reviewing a 12(b)(6) motion "must accept as true all of the factual

allegations contained in the complaint and draw all reasonable inferences in favor of the

plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the

assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679.

## III.  DISCUSSION

### A.  *Reline 1*

#### 1.  **Personal Jurisdiction**

This Court may only assert personal jurisdiction if two conditions are satisfied:

"(1) the exercise of jurisdiction must be authorized under the state's long-arm statute;

and (2) the exercise of jurisdiction must comport with the due process requirements of

the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,

334 F.3d 390, 396 (4th Cir. 2003) (citing *Christian Sci. Bd. of Dirs. of the First Church

of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001)). "The Maryland courts have

consistently held that the state's long-arm statute is coextensive with the limits of

16

personal jurisdiction set by the due process clause of the Constitution." *Id.* (citing *Mohamed v. Michael*, 279 Md. 653, 657 (1977)); *see Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016).

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco*, 582 U.S. 255, 262 (2017). General jurisdiction is determined for individuals based on their domicile and for a corporation based on its place of incorporation and principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods LLC*, 814 F.3d at 189 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). The contacts with the forum state must be "suit-related." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In making this determination, the Court must weigh factors such as, "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods*, 814 F.3d at 189 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)) (internal quotations omitted). "[I]n the business context, purposeful availment may be inferred by the obligation to perform contractual duties in the forum state . . . [or] where the defendant 'reached into the forum state to solicit or initiate business.'" *Ark. Nursing Home Acquisition, LLC v. CFG Comm. Bank*, 460 F. Supp. 3d 621, 639–40 (D. Md. 2020) (quoting *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)) (internal citations omitted).

17

### a) Bregal and Pipe Holdings

Bregal and Pipe Holdings argue that the Court lacks personal jurisdiction over them as they are both German-based corporations and the complaint failed to establish a prima facie case for general or specific personal jurisdiction. *Reline 1*, ECF No. 79-1 at 18. Specifically, they argue that the only allegation within the *Reline 1* complaint regarding Bregal and Pipe Holdings states, "The Individual Defendants [Noll, Flossmann, Allmann, and SML], representatives from the Reline Europe Defendants, and representatives from the Bregal Defendants, and each of them, have engaged in numerous meetings in Maryland and otherwise traveled to Maryland concerning the operations of Reline America." *Reline 1*, ECF No. 73 ¶ 6. Even accepting this allegation as true, Bregal and Pipe Holdings argue that this statement fails to establish that they had "minimum contacts" with Maryland or that any of those contacts had any connection to the lawsuit. *Id.* at 19.

*Reline 1* Plaintiffs argue that the complaint as well as a declaration by Pleasants attached to the response brief sufficiently establish that Bregal and Pipe Holdings exceeded "minimum contacts" with Maryland to establish jurisdiction. *Reline 1*, ECF No. 82 at 14, 16. Specifically, they contend that, because this case arises out of the creation of a joint venture, Reline America, of which Reline Management, an entity actively engaged in business in Maryland, was a member and Reline Management was sold to Bregal and Pipe Holdings at which point Bregal began attending Reline America meetings in Maryland, Bregal and Pipe Holdings purposefully availed themselves of the privilege of conducting business in Maryland. *Id.* at 18–19.

*Reline 1* Plaintiffs also argue that, regardless of any actual contacts between these defendants and Maryland, they should be bound by forum selection provisions in the

Undertaking Agreement, Cooperation Agreement, and Membership Purchase Agreement, which each contain broad forum selection provisions assigning the U.S. District Court for the District of Maryland with exclusive jurisdiction over "all disputes . . . arising out of or related to the transaction, this Agreement and/or the . . . breach thereof." *Id.* at 14–15 (quoting *Reline 1*, ECF No. 79-3 at 14, Cooperation Agreement § 9.4). They contend that "[t]he Forum Selection Clauses apply not just to the express parties to these Agreements but also to non-parties such as [Bregal and Pipe Holdings] who are named as defendants in disputes "arising from" the Definitive Agreements, such as the instant case." *Id.* at 15 (citing *Belfiore v. Summit Fed. Credit Union*, 452 F. Supp. 2d 629, 633 (D. Md. 2006) ("[A]ll participants, parties, and non-parties are covered by choice of forum clauses so long as their alleged conduct is 'closely related' to the contract in question.")). In response to this forum-selection argument, Bregal and Pipe Holdings point out that they are not parties to any of the contracts that contain forum-selection clauses. *Reline 1*, ECF No. 82 at 19 n.5.

*Reline 1* Plaintiffs have failed to establish a prima facie showing of personal jurisdiction over Bregal or Pipe Holdings. First, it is clear that general jurisdiction does not apply to these Germany-domiciled corporations. Next, the only assertion in the complaint regarding any contact Bregal and Pipe Holdings had with Maryland is the statement that "each of them[] have engaged in numerous meetings in Maryland and otherwise travelled to Maryland concerning the operations of Reline America." *Reline 1*, ECF No. 73 ¶ 6. In Pleasants's declaration, he mentions four meetings alleged to have occurred with Bregal and Pipe Holdings representatives in-person in Maryland (*Reline 1*, ECF No. 82-5 ¶¶ 13, 17, 19); however, all four of these meetings occurred in 2022 and *Reline 1* Plaintiffs do not, and cannot, contend that these meetings were related to the

claims against Bregal and Pipe Holdings for tortious interference with contractual relations and prospective advantage, both of which are alleged to have occurred at the time of the sale of RelineEurope three years prior in 2019. To the extent that *Reline 1* Plaintiffs argue that Bregal and Pipe Holdings purposefully availed themselves of the privilege of conducting business in Maryland in way from which the claims against them arose, there are no allegations to support this assertion.

It is also uncontested that Bregal and Pipe Holdings were not signatories to any of the Definitive Agreements. Although sometimes a non-party to an agreement can be subject to a forum selection clause, *Reline 1* Plaintiffs have not alleged facts that would render Bregal and Pipe Holdings, as entities separate from RelineEurope and Reline Management, "so closely related to the dispute that it was foreseeable that [they] would be bound in the event of any dispute." *Tech USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 858 (D. Md. 2009). Moreover, this standard only applies where the non-party is alleged to have participated in "conduct [that] is 'closely related' to the contract in question" and thus requires that the non-party was closely related at the time the forum selection clause was executed. *Belfiore*, 452 F. Supp. at 633. As there is no allegation that Bregal and Pipe Holdings were "closely related" to the contract at the time it was executed, the forum selection clauses do not apply to them.

Finally, *Reline 1* Plaintiffs request that, to the extent the Court determines that there is insufficient information to determine whether it has personal jurisdiction over Bregal and Pipe Holdings, the Court should authorize limited jurisdictional discovery. *Reline 1*, ECF No. 82 at 14. *Reline 1* Plaintiffs, however, have failed to show an entitlement to jurisdictional discovery. "Jurisdictional discovery is proper when the plaintiff has alleged sufficient facts to suggest the possible existence of personal

jurisdiction." *Pandit v. Pandit*, 808 F. App'x 179, 183 (4th Cir. 2020). But "'[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery.'" *Id.* (quoting *Carefirst of Md.* 334 F.3d at 402–03) (internal citations omitted). Plaintiffs have not alleged sufficient facts to suggest the possible existence of personal jurisdiction over Bregal and Pipe Holdings, and therefore the Court denies *Reline 1* Plaintiffs' request for jurisdictional discovery as to Bregal and Pipe Holdings.

### b) Noll, Flossmann, and Allmann

Noll, Flossmann, and Allmann also argue that the Court lacks personal jurisdiction over the claims against them. They point to the fact that "they are not parties (or signatories) in their individual capacities to any of the Definitive Agreements" and further that they lack sufficient contacts with Maryland to establish specific or general personal jurisdiction. *Reline 1*, ECF No. 80-1 at 33.

*Reline 1* Plaintiffs argue that Noll, Flossmann, and Allmann are subject to the forum selection clause in the Undertaking Agreement as they are signatories to that agreement in their individual capacities as "obligors" and they are the ones who negotiated the clauses in the Definitive Agreements. *Reline 1*, ECF No. 81 at 31–33.[7] They also argue that there is specific personal jurisdiction as to Noll, Flossmann, and Allmann, as the complaint alleges that they visited Maryland multiple times to negotiate the Definitive Agreements, executed the agreements in-person in Maryland, created

---

[7] There is ambiguity as to whether Noll, Flossmann, and Allmann are to be considered "obligors" under Undertaking Agreement as there is evidence of their signatures under "obligors" but they are not defined as such in the Definitions section of the Agreement. *See Reline 1,* ECF No. 82-3. However, for the purposes of the pleading stage, the Court will accept as true the allegation that they signed the contract as "obligors."

Reline Management in Maryland, and intended to derive substantial revenue from business in Maryland. *Id.* at 35–36.

Noll, Flossmann, and Allmann are subject to the forum selection clauses and, in any event, the Court has specific personal jurisdiction over the claims against them. "A forum selection clause can be a consent to personal jurisdiction, or at least a waiver of any objection, when invoked by the plaintiff." *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 764 (D. Md. 2009). "[A] forum-selection clause is presumptively valid and enforceable," and only when there is "a clear showing that, in the particular circumstance, enforcement would be unreasonable," may a court deny its application. *Gilman v. Wheat, First Sec., Inc.*, 345 Md. 361, 378 (1997). "[A] party who signs a contract is presumed to have read and understood its terms and [] the party will be bound by them when that document is executed." *Dashiell v. Meeks*, 396 Md. 149, 167 (2006) (citing cases). "Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process" and thus can serve as the basis for personal jurisdiction. *Burger King*, 471 U.S. at 472 n.14 (quoting *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)) (internal citations omitted). *Reline 1* Plaintiffs have satisfactorily alleged that Noll, Flossmann, and Allmann are signatories to the Undertaking Agreement as "obligors" in their individual capacities, *Reline 1*, ECF No. 79-4 at 11, and the Undertaking Agreement includes a forum selection clause requiring "all disputes . . . arising out of or related to the transaction, this Agreement and/or the . . . breach thereof" be filed in this Court, *Reline 1*, ECF No. 79-3 at 14, Cooperation Agreement § 9.4. Based on these alleged facts, Noll, Flossmann, and Allmann would be bound by that forum selection clause. If Noll, Flossmann, and Allmann wished to limit

the application of the clause they "could have bargained for a different forum selection clause." *White Oak Power Constructors v. Alstom Power, Inc.*, Case No. 17-cv-1437-CCB, 2017 WL 5158507, at *4 (D. Md. Nov. 7, 2017). In any event, Plaintiffs have sufficiently alleged that Noll, Flossmann, and Allmann regularly came to the forum state during the negotiation and execution of the Definitive Agreements, from which the claims in this case arise. *Reline 1*, ECF No. 73 ¶¶ 29, 35; ECF No. 81-5 ¶ 2. Therefore, the Court also has specific personal jurisdiction over the claims against Noll, Flossmann, and Allmann. Accordingly, the Court will not dismiss the claims on that basis.

### c)   Anke Masek

The last Defendant who contests personal jurisdiction is Anke Masek.

First, it is clear that general jurisdiction does not apply to Masek, who is domiciled in Germany. *See Reline 1*, ECF No. 89-1 at 7–8.

Next, the only statement in the complaint regarding Masek's alleged contacts with Maryland is the same vague allegation applied to Bregal and Pipe Holdings, specifically "Defendant Masek has also traveled to Maryland on at least one occasion to engage in business relating to Reline America LLC." *Reline 1*, ECF No. 73 ¶ 6. In Pleasants's declaration, he further states that "Ms. Masek traveled to Clarksburg, Maryland on June 18 and 19, 2018, as part of the negotiations of the Definitive Agreements." *Reline 1*, ECF No. 93-5 ¶ 2. For the same reasons as stated above, *see* § III.A.1.a, *infra*, *Reline 1* Plaintiffs have failed to allege facts to show that Masek had sufficient contacts with Maryland or that any contacts were connected to "suit-related" conduct.

Finally, *Reline 1* Plaintiffs argue that the forum selection clauses broadly encompass all disputes arising from the agreement, including their claim against Masek

for civil conspiracy. *Reline 1*, ECF No. 93 at 14. They argue that, even though she did not sign any of the Definitive Agreements, the forum selection clause still applies to her due to her relationship with Noll, Flossmann, and Allmann. *Id*. at 15. They also contend that the Definitive Agreements set forth that they apply to "affiliates" of the entities as well and that Masek is an "affiliate" of the signatories to the agreements. *Id*. at 16. Finally, *Reline 1* Plaintiffs contend that, even if the forum selection clause did not apply, Masek had minimum contacts with the forum state as the owner of RelineEurope and having traveled to Maryland twice in 2018 to negotiate the Definitive Agreements. *Id*. at 19; *Reline 1*, ECF No. 93-5 ¶ 2.

Both the Cooperation Agreement and Operating Agreement define "affiliate" as "a Person who directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the Person in question" and define "control" as "the possession . . . of the power to: (i) vote 51% or more of the outstanding voting securities of or equity ownership interests in a Person; or (ii) otherwise direct the management policies of a Person by contract or otherwise." *Reline 1*, ECF No. 79-2 at 5, Operating Agreement, Art. II; *Reline 1*, ECF No. 79-3 at 23, Cooperation Agreement, Exhibit A. Therefore, Masek does not fit the definition of an "affiliate" as the complaint alleges that Masek only owned a 4.55% interest in RelineEurope and does not allege any facts to support the contention that she had a voting interest in RelineEurope of 51% or more or that she had any power to direct management policies. *See Reline 1*, ECF No. 73 ¶ 67.

Masek's close relationship with RelineEurope, Noll, Flossmann, and Allmann may be sufficient for the forum selection clause to apply to her despite her being a non-party to the Definitive Agreements based on the "closely related" doctrine. But the Court

24

need not decide that question because the claims against Masek fail in any event on statute of limitations grounds as the Court explains below.

### 2.      Statute of Limitations

"When it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss." *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d. 977, 985 (D. Md. 2002) (citing *United States v. Westvaco Corp.,* 144 F. Supp. 2d 439, 441–42 (D. Md. 2001)). "In [an] action based on federal diversity jurisdiction, the Court applies the Maryland statute of limitations as well as Maryland law construing it." *Id.* (citing *Hartnett v. Schering Corp.,* 806 F. Supp. 1231, 1233–34 (D. Md. 1992), *aff'd* 2 F.3d 90 (4th Cir. 1993); *Wade v. Danek Med., Inc.,* 182 F.3d 281, 289 (4th Cir. 1999)) (internal citations omitted).

Under Maryland law, the statute of limitations for civil actions is "three years from the date it accrues." Md. Code Ann., Cts. & Jud. Proc. § 5-101. "One important judicial exception to the statute of limitations in Maryland is the 'discovery rule,' which 'tolls the accrual date of the action until such time as the potential plaintiff either discovers his or her injury, or should have discovered it through the exercise of due diligence.'" *Green v. Pro Football, Inc.*, 31 F. Supp. 3d 714, 722 (D. Md. 2014) (quoting *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131 (2011)). "Under the discovery rule, limitations begin to run when a claimant gains knowledge sufficient to put him or her on inquiry." *Id.* (citing *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 444 (2000)). "[A] motion to dismiss ordinarily should not be granted by a trial court based on the assertion that the cause of action is barred by the statute of limitations unless it is clear from the facts and allegations on the face of the complaint that the statute of

limitations has run." *Id*. at 721–22 (quoting *Litz v. Maryland Dep't of Env't,* 434 Md. 623, 641 (2013); citing *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007)).

### a)    **Noll, Flossmann, and Allmann**

The *Reline 1* claims arise out of alleged actions leading up to and including the sale of RelineEurope to Bregal and Pipe Holdings on November 28 or 29, 2019 and Noll, Flossmann, Allmann, and Masek's subsequent cessation of participation in the joint venture. *Reline 1*, ECF No. 73 ¶¶ 76–89. *Reline 1* Plaintiffs, however, contend that they "did not learn about the sale until months later" and "it was not until March 2021 that [they] became aware that [Bregal and Pipe Holdings] had acquired *all* of the interests in the [RelineEurope and Reline Management], and that Noll, Flossmann, and Allmann were not involved or invested in the joint venture[, RelineEurope, Reline Management, or APTEC]." *Id*. ¶ 95. The original complaint in this case was filed on February 17, 2023, against Noll, Flossmann, Allmann, and SML. *Reline 1*, ECF No. 1. Masek was added upon the filing of the Third Amended Complaint on May 29, 2025. *Reline 1*, ECF No. 73.

*Reline 1* Plaintiffs assert that, pursuant to the discovery rule, the statute of limitations did not begin to run until March 2021 (which would render the *Reline 1* complaint timely). *Reline 1*, ECF No. 81 at 14–15. Noll, Flossmann, and Allmann assert that this argument is undermined by the immediate prior sentence in the complaint that they learned about the sale of RelineEurope within months of it occurring in November 2019 and that accordingly the Court should infer that *Reline 1* Plaintiffs were aware of the alleged breaches prior to February 17, 2020 such that the claims are barred. *Reline 1*, ECF No. 80-1 at 12–14.

While the assertion that *Reline 1* Plaintiffs "learn[ed] about the sale [] months later" does bring into question when the statute of limitations began to run, it is not

clear from the facts of the complaint that this discovery necessarily occurred prior to February 2020 such that the statute of limitation would have run as to Noll, Flossmann, and Allmann. As a motion to dismiss on statute of limitation grounds should not be granted "unless it is clear from the facts and allegations on the face of the complaint that the statute of limitations has run," *Green,* 31 F. Supp. 3d at 721–22, the Court will deny Noll, Flossmann, and Allmann's motion to dismiss on this ground.

### b)   Masek

"[U]nder Maryland law, '[a] plaintiff is not permitted to add a new defendant to a case after the limitations period has expired except to correct the name of a defendant.'" *White v. Date Trucking, LLC*, Case No. 17-cv-1177-ELH, 2018 WL 999963, at *2 (D. Md. Feb. 21, 2018) (quoting *Hanberger v. Smith*, 229 Md. App. 1, 23, *cert. denied*, 450 Md. 430 (2016)). It is undisputed that the *Reline 1* Plaintiffs were not correcting a name but rather adding Masek as a new defendant two years after the commencement of the suit.

Masek asserts that regardless of whether the statute of limitations began to run in November 2019 or March 2021, claims against her were not raised until May 2025, well beyond any three-year limitation. *Reline 1*, ECF No. 89-1 at 14–15.

*Reline 1* Plaintiffs admit that the Third Amended Complaint did not allege that they became aware of Masek's alleged deception in March 2021. *See Reline 1*, ECF No. 93 at 20 n.2. In fact, nothing in the complaint states when they became aware of any alleged involvement by Masek. *Reline 1* Plaintiffs instead request that the Court consider Pleasants's declaration attached to the response brief to the motion to dismiss and dated October 22, 2025 for the fact that "[p]rior to November 20, 2024, Plaintiffs did not know or have any reason to know they had a cause of action against Ms. Masek." *Id*. at 22 (citing *Reline 1*, ECF No. 93-5 ¶ 10). Although for a Rule 12(b)(2) motion the Court is

required to consider additional affidavits not included in the pleadings to determine personal jurisdiction, a Rule 12(b)(6) motion is to be decided on the pleadings and any documents incorporated into the pleadings by reference. *See Hawkins*, 935 F.3d at 226 ("Unlike under Rule 12(b)(6), [under Rule 12(b)(2),] the court may also consider affidavits submitted by both parties."); *see also Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ("a court may not consider extrinsic evidence at the 12(b)(6) stage, generally."). Accordingly, based on the pleadings alone, there is nothing in the complaint to indicate that Plaintiffs did not discover Masek's alleged involvement until after March 2022 (three years before Plaintiffs filed the motion for leave to file the Third Amended Complaint adding her to the case).

Even if the Court were to consider the statements in Pleasants's declaration, this still would be insufficient to render the claim against Masek to be timely. *Reline 1* Plaintiffs were aware of Masek's involvement with the company from the beginning, including that she was involved in the negotiations of the Definitive Agreements and is explicitly mentioned in an exhibit to the Operating Agreement. Upon their discovery of the sale of RelineEurope, *Reline 1* Plaintiffs "through the exercise of due diligence, should have discovered, the *injury*" as they did for the other defendants; therefore, at the latest, the statute of limitations accrued in March 2021. *Hanberger*, 299 Md. at 23 (quoting *Windesheim v. Larocca*, 443 Md. 12, 326–27 (2015)) (internal quotations omitted) (emphasis in original). As Plaintiffs failed to add Masek to the suit prior to the expiration of the statute of limitations, Masek's motion to dismiss will be granted.

### 3.   Failure to State a Claim

#### a)   Breach of Contract Claims (Counts I and II)

To state a claim for breach of contract, a plaintiff "must allege that 'the defendant owed [the plaintiff] a contractual obligation and that the defendant breached that obligation.'" *Level Heating & Air Conditioning Co. v. Patriot Constr., LLC*, Case No. 20-cv-3154-DLB, 2021 WL 5804297, at *4 (D. Md. Dec. 7, 2021) (quoting *Taylor v. NationsBanks, N.A.*, 365 Md. 166, 175 (2001)). Accordingly, in general "a contract cannot be enforced by or against a person who is not a party to it." *In re Collins*, 468 Md. 672, 699 (2020) (quoting *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 593 (1925); citing *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (collecting cases)) (internal quotations omitted). However, "[a] non-party may become bound by a contract if that party's conduct is 'sufficient to manifest acceptance of the terms of a written contract.'" *Kurland v. ACE Am. Ins. Co.*, Case No. 15-cv-2668-JKB, 2017 WL 354254, at *2 (Jan. 23, 2017) (quoting *Porter v. General Boiler Casing Co., Inc.*, 284 Md. 402, 422 (1979)). "'[W]ell-established common law principles,' including estoppel and alter-ego theories, may bind a non-signatory to a contractual clause executed by a third party." *Bartels by and through Bartels v. Saber Healthcare Group, LLC*, 880 F.3d 668, 679 (4th Cir. 2018) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir. 2000)); *see J.J. Ryan & Sons, inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988) (holding that, at least for arbitration clauses, claims against a parent company and its subsidiary based on the same facts may be subject to an agreement even were the parent is not a formal party to the arbitration agreement).

Maryland applies an objective interpretation of contracts. *Level Heating & Air Conditioning*, 2021 WL 5804297, at *4 (citing *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 166 (2003)). "If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Nova Rsch., Inc. v. Penske Truck Leasing Co.,* 405 Md. 435, 448 (2008) (citing *Diamond Point v. Wells Fargo,* 400 Md. 718, 751 (2007)). "If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy-Lene of Wash.,* 376 Md. at 166 (quoting *Cnty. Comm'rs of Charles Cnty. v. St. Charles Assoc. LP*, 366 Md. 426, 445 (2001)) (internal quotations omitted). "A contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Nova Rsch., Inc.,* 405 Md. at 448 (citing *Diamond Point,* 400 Md. at 751).

### i.    Key Definitions within the Definitive Agreements

Article II of the Operating Agreement defines various terms used in the Operating Agreement. "Members" is defined as "Any and all Persons designated as Members of the Company on **EXHIBIT A**" and Exhibit A of the Operating Agreement lists only Reline Holdings and Reline Management. ECF No. 79-2, Operating Agreement at 7, 27. It defines "Required Majority of Members" as "Those Members holding 100% of the Voting Percentage Interest in the Company" with "Voting Percentage Interest" defined as "The Voting power of a Member in the Company set forth opposite each Member's name on **EXHIBIT A,** as long as William D. Pleasants, Jr. and/or Eric A. Newquist is personally involved in the management of the Company. Thereafter, the Voting Percentage Interest of a Member shall be equal to that Member's Percentage Interest."

*Id.* at 7–8. Exhibit A lists Reline Holdings as having a 75% Voting Interest and Reline Management as having a 25% Voting Interest. *Id.* at 27. Accordingly, "Required Majority of Members" means a unanimous vote by Reline Holdings and Reline Management. Finally, "Manager" is defined as "Any Person . . . who becomes a Manager as provided herein" and the Operating Agreement provides that Reline Holdings would be the initial Manager. *Id.* at 6, 14 (Art. VI, Sec. 6.03(E)).

### ii.    Parties to the Contracts

The breach of contract claims in *Reline 1* are asserted by all *Reline 1* Plaintiffs. *Reline 1*, ECF No. 73 at 39–41. However, the contracts alleged to have been breached are the Operating Agreement and Cooperation Agreement. *Id.* Plaintiffs Sugarloaf, Year 2003 Trust, and Pleasants (in his individual capacity) are not parties to those contracts and thus none of the defendants owed them contractual obligations under those contracts. Therefore, to the extent the breach of contract claims in *Reline 1* are asserted by Sugarloaf, Year 2003 Trust, and Pleasants, those claims will be dismissed.

The *Reline 1* breach of contract claims are alleged against RelineEurope as well as other defendants. *Id.* RelineEurope, however, is not a party to the Operating Agreement and Cooperation Agreement. *Id.* Therefore, except where RelineEurope is explicitly incorporated into the Definitive Agreements as a defined affiliate with obligations, the breach of contract claims against RelineEurope will be dismissed.[8]

Finally, Noll, Flossmann, and Allmann, argue that they are not parties to any of the Definitive Agreements and therefore cannot be liable for breach of contract. *Reline 1*,

---

[8] For this same reason, any breach of contract claims asserted by RelineEurope in *Reline 2* will be dismissed.

ECF No. 80-1 at 15. However, *Reline 1* Plaintiffs contend that Noll, Flossmann, and Allmann are signatories of the Undertaking Agreement as "obligors" and, given the relationship between the Definitive Agreements, that they have certain contractual obligations to the *Reline 1* Plaintiffs such that dismissal on this basis is not warranted. ECF No. 81 at 17, 22. At the pleading stage, there are sufficient alleged facts from which the Court can infer that Noll, Flossmann, and Allmann had individual obligations under the Definitive Agreements such that dismissal is not appropriate.

### iii.    Breach of the Global Sale and Non-Assignment Provisions (Count I)

### I.    Global Sale

Regarding assignment of interests, the Operating Agreement provides that "[o]ther than in the event of a global sale of 'Reline America' and 'Reline Europe' and Reline Europe's affiliates to an unaffiliated third-party purchaser (the 'Global Sale'), no Member may Withdraw or Assign their Interests in this Company without the unanimous written consent from all the Members." *Reline 1*, ECF No. 79-2 at 16 (Art. VII, Sec. 7.01). And the Operating Agreement imposes certain restrictions for a Global Sale: (1) it must be after the five-year anniversary of the Operating Agreement, (2) Pleasants must be "provided a reasonable opportunity to be actively and materially involved in the negotiations for the Global Sale," which it defines as Pleasants being "immediately informed about, and given the opportunity to take part in and provide input to, all negotiations regarding a Global Sale," and (3) "Pleasants together with . . . Reline Management shall have the obligation to sell their Interest in Reline America pursuant to such Global Sale." *Id.* (Art. VII, Sec. 7.02).

*Reline 1* Plaintiffs allege that the sale of RelineEurope to Bregal and Pipe Holdings in November 2019 constituted a Global Sale that breached the Operating Agreement as it was before the five-year mark and Pleasants was not provided with an opportunity to be involved in the negotiations of the sale. *Reline 1*, ECF No. 73 ¶¶ 111, 120–125, 169, 170.

The clear language of the Global Sale provision, however, only prevents *members of Reline America* from withdrawing or assigning their membership interests in Reline America except for in a Global Sale. It is undisputed that the only two members of Reline America were Reline Holdings and Reline Management. There is no allegation that Reline Management sold, assigned, or withdrew its membership interest in Reline America. It is clear from the complaint that Reline Management held a 50% membership interest in Reline America before *and after* the November 2019 transaction. It is also clear from the language of the provision that a Global Sale did not occur. A Global Sale is unambiguously defined in the Operating Agreement as "a global sale of 'Reline America' *and* 'Reline Europe' *and* Reline Europe's affiliates to an unaffiliated third-party purchaser." *Reline 1*, ECF No. 79-2 at 16 (Art. VII, Sec. 7.01) (emphases added). The use of the word "and" instead of "or" means that that all three (Reline America, RelineEurope, and RelineEurope's affiliates) must be sold at once to constitute a Global Sale. *See SVF Riva Annapolis LLC v. Gilroy*, 459 Md. 632, 642 (2018) (quoting *The American Heritage Dictionary of the English Language* 1266 (4th ed. 2006)) ("'and' is a conjunction meaning '[t]ogether with or along with; in addition to; as well as[; u]sed to connect words, phrases, or clauses that have the same grammatical function in a construction.'"). During the February 9, 2026 hearing, *Reline 1* Plaintiffs' counsel admitted to this narrow definition. It is undisputed that Reline

America has not been sold; therefore, a Global Sale could not have occurred. Accordingly, Plaintiffs have failed to state a claim for a breach of the Global Sale provision.

## II.    Non-Assignment Provisions

*Reline 1* Plaintiffs also allege that the sale breached Art. II, Sec. 5.11 of the Cooperation Agreement, Art. III, Sec. 10.3 of the Cooperation Agreement, and Sec. 7.3 of the Undertaking Agreement "by improperly assigning their respective interests in Reline America, RelineEurope, and its affiliates to an unaffiliated third-party." *Reline 1*, ECF No. 73 ¶ 171.

The Cooperation Agreement provides that "neither Party nor their respective Affiliates shall assign any of their respective Intellectual Property Rights (the RE IP Rights or the RA IP Rights, as applicable)." *Reline 1*, ECF No. 79-3 at 11–12, Cooperation Agreement Art. II, Sec. 5.11. *Reline 1* Plaintiffs allege that all interests in RelineEurope were sold to Bregal and Pipe Holdings. *Reline 1*, ECF No. 73 ¶¶ 89, 95, 171. However, there is no allegation that any of RelineEurope's intellectual property is now owned by any entity other than RelineEurope. Further, there is no allegation that any of the other defendants owned any of the intellectual property rights defined in the Cooperation Agreement as "RE IP Rights." Accordingly, Plaintiffs' claim for breach of Section 5.11 of the Cooperation Agreement will be dismissed.

Both the Cooperation Agreement and the Undertaking Agreement provide that "[n]either Party shall assign or otherwise transfer any of its rights or obligations under this Agreement without obtaining the prior written consent of the non-assigning Party, which consent by the non-assigning Party may be withheld in its sole and absolute

34

discretion." *Id.* at 18, Cooperation Agreement Art. III, Sec. 10.3; *Reline 1*, ECF No. 79-4 at 7, Undertaking Agreement, Sec. 7.3.

"Party" is defined in the Cooperation Agreement as Reline Management and Reline America, respectively. *Reline 1*, ECF No. 79-3 at 1, Cooperation Agreement. There is no allegation in the complaint that Reline Management assigned or transferred any of its rights or obligations under the Cooperation Agreement to any other entity. Accordingly, Plaintiffs' claim for breach of Section 10.3 of the Cooperation Agreement will be dismissed.

On the other hand, "Party" in the Undertaking Agreement is defined as "the Obligors or the Obligee respectively"; "Obligors" are defined as RelineEurope, SML, and APTEC and "Obligee" is defined as Reline America. *Reline 1*, ECF No. 79-4 at 1, Undertaking Agreement. Plaintiffs also contend that Noll, Flossmann, and Allmann signed the Undertaking Agreement as "obligors" and thus are incorporated into this definition as well. *Reline 1*, ECF No. 81 at 22. As stated above, there is no allegation that Reline Management, or APTEC or SML, assigned any rights or obligations under the Undertaking Agreement. Additionally, RelineEurope is specifically named as a Party here; however, there is no allegation that RelineEurope assigned any of its rights or obligations under this agreement. The complaint does, however, allege that Noll, Flossmann, and Allmann assigned their rights and obligations under the Undertaking Agreement based on the sale of their interest in RelineEurope and the cessation of their involvement in Reline America. *Reline 1*, ECF No. 73 ¶¶ 89, 92, 95, 171. But, as Reline America is the only "obligee" under the Undertaking Agreement, it is the only plaintiff that can assert this claim. Accordingly, Plaintiffs' claims for breach of Section 7.3 of the Undertaking Agreement will be dismissed as to Reline Management, RelineEurope,

SML and APTEC only and as alleged by Pleasants and Reline Holdings as to all defendants.

Therefore, the motion to dismiss the breach of contract claim will be denied as to the breach of Section 7.3 of the Undertaking Agreement claim by Reline America against Noll, Flossmann, and Allmann, but will otherwise be granted.

### iv.    Breach of Additional Express Provisions (Count II)

*Reline 1* Plaintiffs allege that the defendants breached various additional provisions in the Definitive Agreements: (1) Material Acquisition Policy (Sec. 2.2.3 of the Cooperation Agreement; Exhibit B of the Operating Agreement); (2) Future Research & Development Relating to Existing or New Product Lines (Sec. 5.4 of the Cooperation Agreement); (3) Uniform Sales & Marketing Presentations and Techniques (Sec. 2.2.5 of the Cooperation Agreement); (4) Establishment of Common Brand Names & Trade Marks (Sec. 2.2.2 of the Cooperation Agreement); (5) Reline America's Exclusive Territory; Reline Management's Covenant Not to Compete (Sec. 3 of the Cooperation Agreement); (6) Cross-Licenses (Sec. 5.2 of the Cooperation Agreement); and (7) good faith provisions (Sec. 10.6 of the Cooperation Agreement; Secs. 2, 3, and 7.6 of the Undertaking Agreement). *Reline 1*, ECF No. 73 ¶¶ 177–218.

### I.    Material Acquisition Policy

The Cooperation Agreement provides that "[d]ecisions regarding the purchase of raw Materials by the Parties shall be subject to that certain policy entitled 'POLICY REGARDING ACQUISITION OF CERTAIN RAW MATERIALS—LINERS' made a part of the Operating Agreement." *Reline 1*, ECF No. 79-3 at 4, Cooperation Agreement Sec. 2.2.3. The policy states that "it is the objective of the Company to source materials used

in the manufacturing of the liners sold by the Company from suppliers which provide the best overall value to the Company." *Reline 1*, ECF No. 79-2 at 30. It further states, "The Company's related entities located in Europe, and Asia (collectively the 'Reline Group') currently coordinate their purchasing efforts through Anke Masek ('Anke') and Ludwig Allmann ('Ludwig') in an effort to maximize and/or otherwise leverage their combined buying power to get better pricing and/or terms." *Id.* Finally, it states that "[i]n the event the Manager believes that the Company should use a different supplier for one or more of the components sourced by the Reline Group, the Manager will inform Anke and Ludwig . . . with the ultimate decision of the supplier to be based on the decision of Reline Holdings, LLC." *Id.*

*Reline 1* Plaintiffs contend that this provision was breached by Allmann and Masek being replaced by other "individuals who failed to perform the . . . obligation to provide Plaintiffs with the benefit of centralized pricing, including the obligation to provide Reline America its share of rebates" and by the use of alternative suppliers and materials unilaterally and without proper notice. *Reline 1*, ECF No. 73 ¶¶ 126–131, 182–183.

Nothing in the policy requires that Masek and Allmann remain the people coordinating the raw material purchasing in perpetuity. The language of the policy just states that the company "currently coordinate[s] their purchasing efforts through" Masek and Allmann. Therefore, the transition to other individuals to perform these obligations, alone, does not constitute a breach of the policy. To the extent that *Reline 1* Plaintiffs contend that they did not receive required rebates or that suppliers were changed without Reline Holding's decision, the complaint only provides broad conclusory statements rather than any factual allegations to support these conclusions.

37

Without more, these broad statements fail to state a claim upon which relief can be granted. Accordingly, the claim alleging a breach of the Materials Acquisition Policy will be dismissed.

## II.   Future Research & Development Relating to Existing or New Product Lines

The Cooperation Agreement provides that Reline Management, through RelineEurope, would be primarily responsible for research and development ("R&D") and that "[a]ll Intellectual Property Rights arising out of, or relating to, the performance of any R&D performed by either Party during the Term of this Agreement is subject to the Cross-Licenses set forth in Section 5.2 above." *Reline 1*, ECF No. 79-3 at 8–9, Cooperation Agreement, Sec. 5.4. It further provides that at semi-annual R&D meetings, Reline Management and Reline America are to inform one another of any R&D conducted that they consider to be a "Major Improvement" (as defined in the provision) and expressly discusses that no additional costs are required from either one relating the development of the "Pressure Pipe Major Improvement" (as defined in the provision). *Id. Reline 1* Plaintiffs contend that the availability of the Pressure Pipe Improvement technology was promised to them and yet currently remains unavailable. *Reline 1*, ECF No. 73 ¶¶ 132–136.

To the extent that *Reline 1* Plaintiffs argue that the fact that RelineEurope has not made Pressure Pipe Major Improvement technology that is commercially viable, they fail to state a claim as nothing in the provision sets a specific date by which this technology was to be made available. To the extent that *Reline 1* Plaintiffs argue that RelineEurope failed to share information regarding technology developed during the course of the joint venture, that argument would be a breach of the Cross-Licenses

38

provision (as incorporated in this provision). Accordingly, the claim alleging a breach of the Future R&D provision will be dismissed.

### III.   Uniform Sales & Marketing Presentations and Techniques

The Cooperation Agreement states, "The Parties agree to establish uniform sales and marketing presentations and techniques as much as reasonably and commercially practical. [Reline Management] shall be primarily responsible for establishing such uniform sales and marketing presentations and techniques which shall be implemented by [Reline America] in the American Markets." *Reline 1*, ECF No. 79-3 at 4, Cooperation Agreement, Sec. 2.2.5. *Reline 1* Plaintiffs contend that RelineEurope, Reline Management, and APTEC have breached this provision "by not providing the promised sales and marketing support to Reline America" and that since November 2019, they "have failed to establish these techniques." *Reline 1*, ECF No. 73 ¶¶ 137, 139.

These broad conclusory assertions without more are insufficient to state a claim of a breach of this provision. First, there is no indication as to how the Court is to interpret "techniques as much as reasonably and commercially practical" to determine whether any alleged failure to establish these techniques would be a breach of this provision. In any event, *Reline 1* Plaintiffs fail to provide any facts to support these conclusory statements such as any indication of a request for support or specific instance in which Reline Management should have taken action under this provision but did not. Accordingly, the claim alleging a breach of the Uniform Sales & Marketing provision will be dismissed.

## IV.     Establishment of Common Brand Names & Trade Marks

The Cooperation Agreement states, "The Parties agree to establish brand names and trademarks in the American Markets as much as reasonably and commercially practical in order to achieve international acceptance of the common brand names in the American Markets." *Reline 1*, ECF No. 79-3 at 4, Cooperation Agreement, Sec. 2.2.2. *Reline 1* Plaintiffs contend that this provision was breached when RelineEurope, Reline Management, and APTEC "changed their trademarks without prior notice to Reline America," which they only learned of when "a customer brought it to Reline America's attention that such change was being made." *Reline 1*, ECF No. 73 ¶ 143. They allege that the provision was further breached by a failure to coordinate to establish common brand names or trademarks for Reline America. *Id*. ¶ 144.

While the provision requires the establishment of common brand names and trademarks to create international recognition of the common brand and *Reline 1* Plaintiffs contend that RelineEurope, Reline Management, and APTEC changed their trademarks without notice, the complaint does not allege that this resulted in any market confusion. Therefore, Plantiffs of *Reline 1* have not sufficiently stated a claim for a breach of this provision.

*Reline 1* Plaintiffs make no allegations for this breach as to Noll, Flossmann, Allmann, and SML. Accordingly, the claim alleging a breach of the Establishment of Common Brand Names & Trade Marks provision will be dismissed.

## V.     Non-Compete provisions

The Cooperation Agreement provides that Reline America "shall have the exclusive right to market, manufacture, or have manufactured by third parties, sell,

40

service, test, and to install, or have installed by third parties," UVCIPP systems and products within the American Markets. *Reline 1*, ECF No. 79-3 at 5, Cooperation Agreement Sec. 3. It further provides that Reline America would be the only entity licensed to use RelineEurope's IP, sell or lease RelineEurope system related equipment, products or machinery, and manufacture any RelineEurope system related equipment, products or machinery in the American Markets. *Id*. Finally, it provides that Reline Management and any of its affiliates may not engage in any transaction relating to the RelineEurope system in the American Markets. *Id*. In consideration for this provision, the same limitations set for Reline Management in the American Markets are set on Reline America for any market outside of North and South America. *Id*. Sec. 4.

*Reline 1* Plaintiffs contend that RelineEurope, Reline Management, and APTEC "repeatedly contacted existing and potential customers in North and South America, provided said customers with quotes, and provided said customers with misinformation (including about the availability of Pressure Pipe Improvement technology)." *Reline 1*, ECF No. 73 ¶ 201. RelineEurope, Reline Management, and APTEC argue that merely quoting prices and describing the availability of Pressure Pipe Improvement technology does not fall under any of the enumerated activities prohibited by the provision. *Reline 1*, ECF No. 79-1 at 30. RelineEurope, Reline Management, and APTEC also argue in their reply brief that the non-compete provisions are unenforceable because they are impermissibly broad and for an indefinite period. *Reline 1*, ECF No. 85 at 22.

*Reline 1* Plaintiffs adequately allege that contacting customers, quoting prices, and giving information about technology availability would constitute marketing or attempting to sell products to customers in the American Markets, which would constitute a breach of the non-compete provisions. Accordingly, *Reline 1* Plaintiffs have

41

sufficiently stated a claim for a breach of this provision against RelineEurope, Reline Management, and APTEC.

Also, to the extent that RelineEurope, Reline Management, and APTEC argue that the non-compete provisions are invalid as being overbroad and therefore it was unlawful for *Reline 1* Plaintiffs to enforce them, this argument fails as well. First, the cases RelineEurope, Reline Management, and APTEC cite to as authority deemed non-compete provisions as applied to restricting an individual's ability to be employed as being unenforceable when overly broad or for too long of a duration. *See Reline 1*, ECF No. 85 at 22 (citing *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 574 (D. Md. 2019); *Ruhl v. F.A. Bartlett Tree Expert Co.*, 245 Md. 118, 123 (1967)). No authority has been provided to apply this holding to two businesses that bargain for a non-compete clause within their arm's-length agreement. Second, *Reline 1* Plaintiffs have alleged sufficient facts to show that the non-compete provisions were sufficiently narrow for them to be valid. Any allegation as to Plaintiffs applying them in an overbroad manner, as alleged during the February 9, 2026 hearing, would require discovery. Third, "a party who signs a contract is presumed to have read and understood its terms and [] the party will be bound by them when that document is executed." *Dashiell*, 396 Md. at 167 (2006) (citing cases). It is clear that RelineEurope, Reline Management, and APTEC bargained for this provision and in fact included a non-compete provision preventing Reline America from competing outside of the American Markets. *See Reline 1*, ECF No. 79-3 at 5, Cooperation Agreement Secs. 3 & 4. If they wanted a different non-compete provision, they could have bargained for it. *See White Oak Power Constructors*, 2017 WL 5158507, at *4. Accordingly, the motion to dismiss the claim alleging breach of the

non-compete provisions will be denied as to RelineEurope, Reline Management, and APTEC.

*Reline 1* Plaintiffs make no allegations for this breach as to Noll, Flossmann, Allmann, and SML. Accordingly, the claim alleging breach of the non-compete provisions against Noll, Flossmann, Allmann, and SML will be dismissed.

## VI.    Cross-Licenses

The Cooperation Agreement provides that "The Parties hereby grant to one another the following licenses to Use the Intellectual Property Rights relating to their respective Systems (the RE IP Rights and the RA IP Rights) . . . . As part of such Cross-Licenses, the Party granting such Cross-License has an obligation to reasonably share with the other Party technical information and Know-how regarding the Intellectual Property Rights being licensed." *Reline 1*, ECF No. 79-3 at 6–7, Cooperation Agreement Sec. 5.2. *Reline 1* Plaintiffs contend that RelineEurope, Reline Management, and APTEC breached this provision by failing to disclose information about new, innovative liners that they have been developing. *Reline 1*, ECF No. 73 ¶ 205.

RelineEurope, Reline Management, and APTEC argue that the provision only provides the obligation to *reasonably share* technical information and know-how regarding IP to be licensed and, given that the complaint fails to allege that *Reline 1* Plaintiffs requested any technical information or know-how and were unreasonably refused that information, they have failed to state a claim for a breach of this provision. *Reline 1*, ECF No. 79-1 at 30–31. They also argue that the complaint fails to allege any specific information not shared by RelineEurope, Reline Management, and APTEC. *Id*. *Reline 1* Plaintiffs argue that whether there has been a breach of the provision is a

factual issue that should not be decided at the motion to dismiss stage. *Reline 1*, ECF No. 82 at 34.

While the complaint only vaguely states a failure to provide technological information in violation of the cross-licenses provision, this claim is sufficiently pled against RelineEurope, Reline Management, and APTEC to allow further discovery on this claim. No allegations, however, were pled against Noll, Flossmann, Allmann, and SML for violation of this provision. Accordingly, the motion to dismiss the claim alleging breach of the cross-licenses provision against Noll, Flossmann, Allmann, and SML will be granted and the motion to dismiss this claim against RelineEurope, Reline Management, and APTEC will be denied.

## VII.    Good faith provisions

The Cooperation Agreement provides that Reline Management and Reline America "agree to act in good faith under this Agreement." *Reline 1*, ECF No. 79-3 at 18, Cooperation Agreement Sec. 10.6. The Undertaking further provides that the same provision to act in good faith under the agreement as applied to the obligors, RelineEurope, APTEC, Reline Management, Noll, Flossmann, and Allmann. *Reline 1*, ECF No. 79-4 at 3, 8, Undertaking Agreement Secs. 3, 7.6.

These provisions require only good faith in fulfilling the obligations in the agreements. It is unclear whether these provisions provide any enforceable contractual obligations other than those expressly stated, but given that at least some of the breach claims will survive the motion to dismiss and *Reline 1* Plaintiffs contend that these breaches were done in bad faith, they have sufficiently stated a claim for breach of the good faith provisions as to Reline Management, RelineEurope, APTEC, Noll, Flossmann, and Allmann. As no breach of contract claim has been sufficiently stated

against SML, the claim alleging breach of the good faith provisions against SML will be dismissed. The motions to dismiss this claim as to Reline Management, RelineEurope, APTEC, Noll, Flossmann, and Allmann will be denied.

### b)   Breach of Fiduciary Duties (Count III)

"To establish a breach of fiduciary duty, a plaintiff must demonstrate: (1) the existence of a fiduciary relationship; (2) breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Plank v. Cherneski*, 469 Md. 548, 559 (2020). The Maryland LLC statute is silent as to the fiduciary duties owed by members or managers, "leaving the matter to be addressed in the operating agreement, or through judicial common-law development." *Id.* at 571–72 & n.7. The Maryland Supreme Court has held that a "managing member[] of an LLC owe[s] common law fiduciary duties to the LLC and to the other members based on principles of agency." *Id.* at 572 (citing *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586 (2011)). Courts have diverged as to whether non-managing members owe fiduciary duties to the LLC or to other members. *See In re Gasser*, Case Nos. 18-19874-NVA, 18-19911-NVA, 2025 WL 2778732, at *9 n.8 (Bankr. D. Md. Sept. 29, 2025) (holding that non-managing members do not owe statutory or common law fiduciary duties to an LLC or a managing member); *Xereas v. Heiss*, 987 F.3d 1124, 1131-32 (D.C. Cir. 2021) (citing *Calomiris v. Calomiris*, 3 A.3d 1186 (D.C. 2010); *Plank*, 469 Md. at 572) (holding that members of a member-managed LLC owed fiduciary duties to the LLC and to one another); *Sethi v. Potomac Valley Orthopaedic Assoc., Chartered*, Case No. 24-cv-1063-TDC, 2024 WL 3606595, at *8 (D. Md. July 31, 2024) (declining to dismiss breach of fiduciary duty claims against non-managing LLC members as the issue regarding fiduciary duties owed by non-managing members was not settled).

45

*Reline 1* Plaintiffs contend that Noll, Flossmann, Allmann, SML, Reline Management, RelineEurope, and APTEC owed them fiduciary duties by entering into a joint venture with them by negotiating the sale of their interests in Reline America, RelineEurope, SML, and APTEC while negotiating the formation of Reline America. *Reline 1*, ECF No. 73 ¶¶ 220–226; *Reline 1,* ECF No. 81 at 25–26. They contend that this duty is based on the fact that "[p]artners in a joint venture stand in a fiduciary relationship toward one another." *Reline 1,* ECF No. 81 at 25–26 (quoting *Precon Corp. v. G&B Env't*, 103 F.3d 119 (Table), 1996 WL 694440, at *6 (4th Cir. Dec. 5, 1996)).

### i.    Sugarloaf and Year 2003 Trust

*Reline 1* Plaintiffs provide no facts to support the contention that Sugarloaf and Year 2003 Trust had a fiduciary relationship with any of the defendants or, to the extent any existed, that the duty was breached as to Sugarloaf and Year 2003 Trust, specifically. Accordingly, the breach of fiduciary duty claims alleged by Sugarloaf and Year 2003 Trust will be dismissed.

### ii.    RelineEurope and APTEC

RelineEurope and APTEC argue that they do not have any relationship with *Reline 1* Plaintiffs that would give rise to fiduciary duties. *Reline 1*, ECF No. 79-1 at 32.

*Reline 1* Plaintiffs argue that, given that this case arises from an alleged joint venture, and "[p]artners in a joint venture stand in a fiduciary relationship toward one another," they have sufficient alleged that RelineEurope and APTEC owed fiduciary duties to them. *Reline 1*, ECF No. 82 at 35 (quoting *Precon Corp.*, 1996 WL 694440, at *6). Fiduciary duties "'cover[] not only dealings and transactions occurring during the partnership but also those taking place during the negotiations leading to the formation of the partnership.'" *Precon Corp.*, 1996 WL 694440, at *6 (quoting *Allen v. Steinberg*,

224 Md. 119, 128 (1966)). *Reline 1* Plaintiffs contend that, "[a]s such, given that Defendant Reline Management is in a joint venture with Plaintiffs, the Reline Europe Defendants owe fiduciary duties to Plaintiffs. To the extent that Defendants are arguing that there was not a joint venture here, that is generally a question for the jury." *Reline 1*, ECF No. 82 at 35.

Any alleged joint venture formed through the creation of Reline America was between Reline Management and Reline Holdings. *Reline 1* Plaintiffs allege no facts to support the contention that RelineEurope or APTEC, neither of which are members of Reline America, had a fiduciary relationship with any of the *Reline 1* Plaintiffs. *Reline 1* Plaintiffs have not alleged facts or identified authority to support the contention that a joint venture entered into by two companies created fiduciary duties in third-party companies. Even considering the fact that RelineEurope and APTEC are mentioned in some of the Definitive Agreements, there is nothing to support that alone giving rise to fiduciary duties. Therefore, the breach of fiduciary duty claim as to RelineEurope and APTEC will be dismissed.

### iii.    Noll, Flossmann, Allmann, and SML

Noll, Flossmann, and Allmann argue that they had no fiduciary relationship with any of the *Reline 1* Plaintiffs as they were parties in an arm's-length commercial transaction, which does not create any fiduciary duties as it is expected that the parties are seeking the best advantage for themselves. *Reline 1*, ECF No. 80-1 at 23–24 (citing *Reutemann v. AffirmX LLC,* Case No. 21-cv-2191-DKC, 2022 WL 2953045, *5 (D. Md. July 26, 2022) (dismissing breach of fiduciary duty claim because the allegation that the parties "spoke almost daily and that they and their families socialized together . . . was not enough to plead a fiduciary relationship"); *S. Atl. Ltd. P'ship of Tenn. L.P. v. Riese*,

284 F.3d 518, 533 (4th Cir. 2002) ("even when parties to an arms-length transaction have reposed confidence in each other, no fiduciary duty arises unless one party thoroughly dominates the other"); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App. 1996) ("The fact a business relationship has been cordial and of long duration is not by itself evidence of a confidential relationship. The fact one businessman trusts another and relies upon another to perform a contract does not rise to a confidential relationship. Subjective trust is not enough to transform arms-length dealing into a fiduciary relationship.") (citations omitted)). SML also argues that *Reline 1* Plaintiffs have failed to plead a cognizable breach of fiduciary duty claim against it. *Reline 1*, ECF No. 80-1 at 23.

*Reline 1* Plaintiffs argue that "upon the execution of the Definitive Agreements, fiduciary relationship between Plaintiffs and the Individual Defendants existed" based on their assertion that partners to a joint venture owe one another fiduciary duties. *Reline 1*, ECF No. 81 at 26. They further argue that a fiduciary duty was created even prior to the execution of the Definitive Agreements based on the fact that Noll, Flossmann, and Allman approached Pleasants about forming the partnership, thus creating in Pleasants a "confidence" that they "purport[ed] to act or advise with the other's interest in mind." *Id.* (quoting *Buxton v. Buxton*, 363 Md. 634, 654–55 (Md. 2001)). Finally, *Reline 1* Plaintiffs contend that "an arms-length transaction typically does not create a fiduciary relationship ***if*** the purpose of the transaction is to 'further their own separate business objectives, rather than join[] together to achieve a common business objective'" and, given that they negotiated to create a joint venture, *Reline 1* Plaintiffs have sufficiently pled that a fiduciary duty existed. *Id.* at 27 (quoting *Brass*

*Metal Prod., Inc. v. E-J Enter., Inc.*, 189 Md. App. 310, 358 (2009)) (emphasis in original).

*Reline 1* Plaintiffs have failed to make any allegation that SML owed fiduciary duties to any of the plaintiffs as they do not contend that SML participated in any negotiations or was a member of Reline America.  Therefore, the breach of fiduciary duty claim against SML will be dismissed.

As to Noll, Flossmann, and Allmann, *Reline 1* Plaintiffs have failed to allege facts to support the contention that Noll, Flossmann, and Allmann **in their individual capacities** owed fiduciary duties to Reline America, Reline Holdings, or Pleasants. Similar to *Reutemann*, the frequency with which Noll, Flossmann, and Allmann communicated with *Reline 1* Plaintiffs and any business relationship that formed over the years did not create a **fiduciary** relationship. Even if Noll, Flossmann, and Allmann withheld information from *Reline 1* Plaintiffs during the negotiations of the formation of Reline America, this constituted an arm's-length transaction that did not create any fiduciary duty. Therefore, the breach of fiduciary duty claim against Noll, Flossmann, and Allmann will be dismissed.

### iv.    Reline Management

Reline Management argues that, as a non-managing member, it does not owe fiduciary duties to any of the *Reline 1* Plaintiffs. *Reline 1*, ECF No. 79-1 at 33. It points out that there has been no statute or case law that expressly addresses whether non-managing LLC members owe fiduciary duties to the LLC or other members. *Id.* (citing *George Wasserman & Janice Wasserman Goldsten Family LLC*, 197 Md. App. at 616, *abrogated on other grounds by Plank*, 469 Md. at 626 n.8).

*Reline 1* Plaintiffs argue that, for the same reasons as stated above, Reline Management was a partner to a joint venture and thus owed fiduciary duties. *Reline 1*, ECF No. 82 at 35–36. In their brief, *Reline 1* Plaintiffs offered no response to the argument that Reline Management did not owe a fiduciary duty to them as the non-managing member of the LLC. But, during the February 9, 2026 hearing, they directed the Court to *Xereas*, 987 F.3d at 1131–32, and *Sethi*, 2024 WL 3606595, at \*8, arguing that these cases supported the contention that non-managing members owed fiduciary duties to the LLC and managing members.

Plaintiffs' reliance on *Xereas* is misplaced as there the court held that because the individuals were "at once members *and managers* of the LLC" (based on it being a member-managed LLC), they owed fiduciary duties to one another. 987 F.3d at 1131–32 (emphasis added). For Reline America, however, the sole manager is Reline Holdings. *See Reline 1*, ECF No. 79-2 at 14, Operating Agreement Art. VI, Sec. 6.03(E). Reline Management is not and has never been a manager of the LLC. Given that there is no provision in the Definitive Agreements that expressly provides that Reline Management owed fiduciary duties to Reline America or Reline Holdings and there is no statutory or common-law fiduciary duty, *Reline 1* Plaintiffs' argument fails on this basis.

*Reline 1* Plaintiffs also allege, however, that irrespective of Reline America's status as an LLC, the parties intended Reline Management and Reline Holdings to be entering into a *joint venture* through which fiduciary duties would arise. There is no provision in the Definitive Agreements explicitly waiving fiduciary duties, and both parties refer to Reline America as a "joint venture." Although, at the February 9, 2026 hearing, Reline Management contended that they meant "joint venture" in a colloquial rather than legal sense, this is a factual question that would require further discovery to

determine whether the parties intended Reline Management to owe fiduciary duties to Reline Holdings and Reline America. Therefore, the motion to dismiss the breach of fiduciary duties claim as asserted by Reline Holdings and Reline America against Reline Management will be denied.

Plaintiffs have failed to allege any facts to support the contention that Reline Management owed any fiduciary duty to Pleasants as an individual. Therefore, the breach of fiduciary duties claim as asserted by Pleasants against Reline Management will be dismissed.

### c)      Fraud (Count IV)

Federal Rule of Civil Procedure 9(b) requires that fraud be pled with particularity, including "the 'time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what [was] obtained thereby.'" *Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298, 313–14 (D. Md. 2000) (quoting *Windsor Assocs. v. Greenfeld*, 564 F. Supp. 273, 280 (D. Md. 1983)). The heightened pleading standard applies to claims of fraudulent concealment as well. *Mendez v. Gen. Motors, LLC*, Case No. 22-cv-0853-JMC, 2022 WL 2333851, at *2 (D. Md. June 28, 2022). "[A] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied: '(1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Adams v. NVR Homes, Inc.*, 193 F.R.D 243, 250 (D. Md. 2000) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). "[W]here there are multiple defendants, plaintiffs must, where the gravamen of the claim is fraud, allege all claims with particularity as to each of the defendants." *Id*. at 251 (citing *Wang*

*Labs., Inc. v. Burts,* 612 F. Supp. 441, 445 (D. Md. 1984); *Pitten v. Jacobs,* 903 F. Supp. 937, 951 (D.S.C. 1995)).

A claim for fraudulent inducement requires that "(1) the defendant asserted a false representation of material fact to the plaintiff; (2) the defendant knew that the representation was false, or the representation was made with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to the defendant; (3) the defendant made the false representation for the purpose of defrauding the plaintiff; (4) the plaintiff relied with justification upon the misrepresentation; and (5) the plaintiff suffered damages as a direct result of the reliance upon the misrepresentation." *DePasquale v. Blomquist*, Case No. 2501, 2021 WL 1827203, at *8 (Md. App. May 7, 2021) (citing *First Union Nat'l Bank v. Steele Software Sys. Corp.,* 154 Md. App. 97, 134 (2003), *cert. denied*, 380 Md. 619 (2004); *Maryland Env't Tr. v. Gaynor*, 370 Md. 89, 97 (2002); *Sass v. Andrew*, 152 Md. App. 406, 429 (2003)).

For a fraudulent concealment claim, a plaintiff must allege that "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 138 (2007) (quoting *Green v. H & R Block,* 355 Md. 488, 525 (1999)) (internal quotations omitted). "A duty to disclose arises in certain relationships such as a confidential or fiduciary relationship." *Hogan v. Md. State Dental Ass'n*, 155 Md. App. 556, 566 (2004) (citing *Doe v. Doe*, 122 Md. App. 295, 354, (1998), *rev'd on other grounds*, 358 Md. 113 (2000)). "[O]rdinarily when one owes no legal obligation to

52

speak, mere silence is not actionable; but if what is stated amounts to a 'partial and fragmentary' disclosure, that misleads because of its incompleteness, the 'legal situation is entirely changed.'" *Lubore v. RPM Assocs., Inc.*, 109 Md. App. 312, 330, (1996) (quoting *Brager v. Friedenwald*, 128 Md. 8, 31–32 (1916)).

A complaint for fraudulent concealment "must also contain specific allegations of how the fraud kept the plaintiff in ignorance of a cause of action, how the fraud was discovered, and why there was a delay in discovering the fraud, despite the plaintiff's diligence." *Thomas v. Ethicon, Inc.*, Case No. 20-cv-3729-GLR, 2021 WL 6126300, at *8 (D. Md. Dec. 28, 2021) (quoting *Douglass v. NTI-TSS, Inc.*, 632 F. Supp. 2d 486, 491 (D. Md. 2009)) (internal quotations omitted). But "Rule 9(b) is 'less strictly applied with respect to claims of fraud by concealment' or omission of material facts, as opposed to affirmative misrepresentations, because 'an omission cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 533 (D. Md. 2013) (quoting *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997)) (internal quotations omitted).

Generally, where a party has capacity and has an opportunity to read a written contract prior to executing it, then the parol evidence rule applies and the party "cannot later claim fraud in the inducement." *Cent. Truck Ctr., Inc. v. Cent. GMC, Inc.*, 194 Md. App. 375, 392–93 (2010) (quoting *One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1282, 1287 (D.C. Cir. 1988)). This is especially true where the contract includes an integration clause disclaiming reliance on prior statements made or external documents not incorporated into the agreement. *Id.* at 393.

53

*Reline 1* Plaintiffs assert a number of different theories for fraud. First, they contend that RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann "made numerous misrepresentations to Plaintiffs to induce them to enter into the [formation of Reline America] when, in actuality, during the [t]ransaction's negotiations, the [RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann] were simultaneously pursuing the Global Sale by planning, making preparations for, and ultimately negotiating a sale of their interests with third-parties." *Reline 1*, ECF No. 73 ¶ 234. Second, *Reline 1* Plaintiffs contend that "[b]eginning in January 2018, the [RelineEurope, Reline Management, and APTEC] intentionally concealed from Plaintiffs that they were negotiating with third-party purchasers." *Id.* ¶ 237. Third, *Reline 1* Plaintiffs contend that RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann intentionally misrepresented that the purpose of restructuring the Definitive Agreements based on the formation of Reline Management was to comply with German laws when it was done to allow them to go foward with selling their interests. *Id.* ¶ 238. Fourth, they assert that RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann "intentionally misrepresented to Plaintiffs the status of the development and commercial viability of the Pressure Pipe Improvement technology" and state that "[t]hat was not accurate." *Id.* ¶¶ 240–241. Fifth, they assert that RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann "purposely concealed from Plaintiffs certain developments as to products, equipment, machinery, and other technologies, including as to alternative fiberglass materials." *Id.* ¶ 243. Finally, they contend that during the negotiation of the Definitive Agreements, RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann "made numerous representations to Plaintiffs that

54

they were going to be personally involved in the management and operation of the joint venture." *Id.* ¶ 244. *Reline 1* Plaintiffs contend that they relied on these representations or lack thereof and would not have entered into the Definitive Agreements if they had known this information. *Id.* ¶¶ 239, 242, 244. They assert that they "were justified in their reliance on the representations of [RelineEurope, Reline Management, APTEC, SML, Noll, Flossmann, and Allmann], with whom Pleasants had developed a 15-year business relationship." *Id.* ¶ 248.

### i.    Noll, Flossmann, and Allmann

Noll, Flossmann, and Allmann argue that the complaint does not meet the heightened pleading standard under Rule 9(b) as *Reline 1* Plaintiffs do not identify any specific false statement of facts made by any specific individuals. *Reline 1*, ECF No. 80-1 at 26. They contend that *Reline 1* Plaintiffs' generalized allegations regarding all seven defendants against whom this claim is asserted are insufficient to plead a fraud claim. *Id.* Noll, Flossmann, and Allmann contend that *Reline 1* Plaintiffs are relying on impermissible group pleading by vaguely lodging allegations against "Individual Defendants," without more. *Reline 1*, ECF No. 86 at 20–21. Additionally, they argue that the complaint lacks actual facts to support its general assertions regarding concealment or non-disclosure of information by Noll, Flossmann, and Allmann. *Reline 1*, ECF No. 80-1 at 29. Noll, Flossmann, and Allmann also contend that Maryland's parole evidence rule prohibits the introduction of pre-contractual representations concerning matters covered in the fully integrated written contract. *Id.* at 30 (citing *One-O-One Enter*, 848 F.2d at 1287; *Cent. Truck Ctr., 194* Md. App. 375). Finally, they argue that the complaint fails to allege how *Reline 1* Plaintiffs reasonably relied on the alleged misrepresentations despite the plain language of the agreement. *Id.* at 31–32.

*Reline 1* Plaintiffs contend that the complaint details various misrepresentations, such as: Noll, Flossmann, and Allmann "induced the Plaintiffs to enter this transaction [through] their material omissions of fact concerning the restructuring of the transaction and their ultimate sale and assignment of their interests to [Bregal and Pipe Holdings] prior to the designated five-year period," citing *Reline 1*, ECF No. 73 ¶¶ 66–96; Noll, Flossmann, and Allmann each made misrepresentations about the status of the development and commercial viability of the Pressure Pipe Improvement technology, citing *id.* ¶ 101, "omitted material facts concerning the development of new liners," citing *id.* ¶ 156, "made intentional misrepresentations concerning sales and marketing support," citing *id.* ¶ 103, "and misrepresented centralized purchasing of materials and utilization of alternative suppliers," citing *id.* ¶¶ 126–31. *Reline 1*, ECF No. 81 at 29. Next, they argue that claims of fraudulent inducement provide a well-established exception to the parole evidence rule. *Id.* at 30 (citing *Childers Oil Co. v. Exxon Corp.*, 960 F.2d 1265, 1270 (4th Cir. 1992); *DePasquale*, 2021 WL 1827203, at *12). Based on their claim of fraudulent inducement, *Reline 1* Plaintiffs contend that they have sufficiently alleged that they justifiably relied on the misrepresentations.

Next is *Reline 1* Plaintiffs' claim that Noll, Flossmann, and Allmann "made numerous misrepresentations to Plaintiffs to induce them to enter into the [formation of Reline America] when, in actuality, during the [t]ransaction's negotiations, the [Noll, Flossmann, and Allmann] were simultaneously pursuing the Global Sale by planning, making preparations for, and ultimately negotiating a sale of their interests with third-parties." *Reline 1*, ECF No. 73 ¶ 234. But as explained above, based on the clear language of the Operating Agreement, Noll, Flossmann, and Allmann did not engage in a Global Sale and the complaint fails to allege that they were attempting to pursue a Global Sale,

rather than an assignment of their interest in Reline Europe *See* § III.A.3.a.iii.I., *infra.* Accordingly, this claim fails too. Additionally, *Reline 1* Plaintiffs have failed to allege how Noll, Flossmann, and Allmann's engagement in simultaneous arm's-length negotiations prior to the execution of the Definitive Agreements constituted fraud.

As to *Reline 1* Plaintiffs' second claim against Noll, Flossmann, and Allmann that they intentionally misrepresented that German laws were the purpose of restructuring the Definitive Agreements based on the formation of Reline Management, *Reline 1* Plaintiffs have failed to allege facts from which to reasonably plead that it was justifiable for Plaintiffs, as experienced businesses and businessmen, or their counsel, to rely on a representation regarding German law by the people with whom they were engaging in an arm's-length transaction without verification. *Reline 1*, ECF No. 73 ¶ 238. Therefore, this claim fails.

As to *Reline 1* Plaintiffs' third claim that Noll, Flossmann, and Allmann "intentionally misrepresented to Plaintiffs the status of the development and commercial viability of the Pressure Pipe Improvement technology," *Reline 1* Plaintiffs fail to allege specific statements made by specific individuals and how those statements were knowingly false or with reckless disregard for the truth. *Id*. ¶¶ 101, 240–241. As previously stated, *Reline 1* Plaintiffs have not alleged any representation that the Pressure Pipe Improvement technology was to be commercially viable by a specific date or that any delay in its viability was intentional. To the extent that any statements were made, responsibility for the Pressure Pipe Improvement technology was explicitly included in the Cooperation Agreement, which included an integration clause. *Reline 1*, ECF No. 79-3 at 8–9, Cooperation Agreement, Sec. 5.4; *Reline 1*, ECF No. 79-3 at 20, Cooperation Agreement, Sec. 10.10 ("This Agreement contains the entire agreement

between the Parties and is intended to be an integration of all prior agreements, conditions or undertakings between the Parties hereto."). If *Reline 1* Plaintiffs expected Noll, Flossmann, and Allmann to be bound by any representations regarding the commercial viability of the technology, they should have included it into the agreements. Therefore, this claim fails.

Next, *Reline 1* Plaintiffs claim that Noll, Flossmann, and Allmann "purposely concealed from Plaintiffs certain developments as to products, equipment, machinery, and other technologies, including as to alternative fiberglass materials." *Reline 1*, ECF No. 73 ¶ 243. The only facts alleged in the complaint regarding fiberglass materials or any failure to disclosure information on new liners or technological development are asserted only against RelineEurope, Reline Management, and APTEC and do not refer to Noll, Flossmann, and Allmann whatsoever. *Id*. ¶¶ 156–158. In any event, this claim fails as a fraudulent concealment claim requires there to be a duty to disclose and the complaint fails to allege any facts that would establish a duty by Noll, Flossmann, and Allmann, as individuals, to disclose product information. Further, the complaint lacks any specific allegations as to the time at which this alleged concealment occurred and whether Noll, Flossmann, and Allmann were still involved with the companies at that time. Therefore, this claim fails.

Finally, *Reline 1* Plaintiffs contend that during the negotiation of the Definitive Agreements, Noll, Flossmann, and Allmann "made numerous representations to Plaintiffs that they were going to be personally involved in the management and operation of the joint venture." *Id*. ¶ 244. This argument, however, is also barred based on the various integration clauses. *See i.e., Reline 1*, ECF No. 79-3 at 20, Cooperation Agreement, Sec. 10.10; *Reline 1*, ECF No. 79-2 at 25, Operating Agreement Art. XVI, Sec.

16.12. Within the definition of "Voting Percentage Interest," the Operating Agreement provides a caveat that it only applies "as long as William D. Pleasants, Jr. and/or Eric A. Newquist is personally involved in the management of the Company." *Reline 1*, ECF No. 79-2 at 8, Operating Agreement Art. II. However, no such caveat or requirement is included in any of the agreements that Noll, Flossmann, and Allmann were to remain involved in the venture. Therefore, this claim fails.

Accordingly, the motion to dismiss the fraud claims against Noll, Flossmann, and Allmann will be granted.

### ii.    RelineEurope, Reline Management, APTEC, and SML

RelineEurope, Reline Management, APTEC, and SML argue that the complaint does not meet the heightened pleading standard as *Reline 1* Plaintiffs do not identify any specific misrepresentation by any specific defendant. *Reline 1*, ECF No. 79-1 at 35; *Reline 1*, ECF No. 80-1 at 26. They further argue that, to the extent that any misrepresentations were alleged to have been made regarding the personal involvement in the management and operation of Reline America, these allegations are against Noll, Flossmann, and Allmann, not RelineEurope, Reline Management, APTEC, and SML. *Reline 1*, ECF No. 79-1 at 38. RelineEurope, Reline Management, APTEC, and SML contend that *Reline 1* Plaintiffs are relying on impermissible group pleading by vaguely lodging allegations against "Reline Europe Defendants," without specifying who from which of these entities made each of the statements, when it was said, or what they actually said. *Reline 1*, ECF No. 85 at 26.

*Reline 1* Plaintiffs contend that the complaint details various misrepresentations clearly but provides no examples of misrepresentations made by SML and provides only

one example related to RelineEurope, Reline Management, and APTEC: that "Reline Europe Defendants made false statements to Plaintiffs about the Transaction and that these misrepresentations were made during the negotiations of the Transaction in 2018." *Reline 1*, ECF No. 82 at 39–40 (citing *Reline 1*, ECF No. 73 ¶¶ 84, 86, 89, 97).

Despite *Reline 1* Plaintiffs' citation to various paragraphs in the complaint, the only paragraph that relates to a misrepresentation allegedly made by RelineEurope, Reline Management, APTEC, or SML, broadly states, "During the negotiation of the Transaction, Noll, Flossmann, Allmann, and the Reline Europe Defendants each negligently and/or intentionally made certain false statements and representations and/or failed to disclose material facts to the Plaintiffs concerning the Transaction, which were reasonably relied on by the Plaintiffs to induce them to enter into the Transaction." *Reline 1*, ECF No. 73 ¶ 97. This statement fails the plead the "time, place and contents of the false representation, as well as the identity of the person making the misrepresentation." *Superior Bank*, 197 F. Supp. 2d at 313–14 (internal quotations omitted). This broad conclusory statement also fails to make RelineEurope, Reline Management, APTEC, and SML *individually* "aware of the particular circumstances for which [it] will have to prepare a defense at trial." *Adams*, 193 F.R.D. at 250 (internal quotations omitted). Therefore, this claim fails.

*Reline 1* Plaintiffs also contend that "[b]eginning in January 2018, the [RelineEurope, Reline Management, and APTEC] intentionally concealed from Plaintiffs that they were negotiating with third-party purchasers." *Id*. ¶ 237. The complaint, however, fails to allege how RelineEurope, Reline Management, and APTEC owed any duty to disclose this information prior to the execution of the Definitive Agreements. As the Court has reiterated, this was an arm's-length transaction in which RelineEurope,

Reline Management, and APTEC had the right to consider multiple options prior to the execution of the agreements. Therefore, this claim fails.

As to *Reline 1* Plaintiffs claim that RelineEurope, Reline Management, APTEC, and SML intentionally misrepresented that the purpose of restructuring the Definitive Agreements based on the formation of Reline Management was to comply with German laws when it was done to allow them to go toward with selling their interests, for the same reasons previously stated, this claim fails as Plaintiffs have failed to adequately allege justifiable reliance. *Id.* ¶ 238; *see* § III.A.3.c.i, *infra*.

Next, they assert that RelineEurope, Reline Management, APTEC, and SML "intentionally misrepresented to Plaintiffs the status of the development and commercial viability of the Pressure Pipe Improvement technology." *Id.* ¶¶ 240–241. Plaintiffs failed to assert how the Pressure Pipe Improvement technology related to APTEC or SML and further failed to allege specific misrepresentations made by these entities that were fraudulent. Therefore, for the same reasons stated above, *see* § III.A.3.c.i, *infra*, this claim fails.

As to *Reline 1* Plaintiffs' assertion that RelineEurope, Reline Management, APTEC, and SML "purposely concealed from Plaintiffs certain developments as to products, equipment, machinery, and other technologies, including as to alternative fiberglass materials," Plaintiffs fail to allege that APTEC or SML had any responsibilities for these products and technologies or any duty to disclose them. *Id.* ¶ 243. Therefore, this claim fails as to APTEC and SML. To the extent that *Reline 1* Plaintiffs allege that RelineEurope and Reline Management failed to disclose this information, they have sufficiently stated a claim for this claim to continue for now; however, *Reline 1* Plaintiffs will need to demonstrate to the Court how this failure constituted fraud rather than

61

simply a breach of contract, *see* § III.A.3.a.iv.VI, *infra*. The complaint, however, fails to allege any duty to disclose as to Sugarloaf, Year 2003 Trust, or Pleasants or that either of these entities or Pleasants, as an individual, relied on any alleged concealment. Accordingly, any fraud claims alleged by Sugarloaf and Year 2003 Trust will be dismissed.

Finally, *Reline 1* Plaintiffs contend that during the negotiation of the Definitive Agreements, RelineEurope, Reline Management, APTEC, and SML "made numerous representations to Plaintiffs that they were going to be personally involved in the management and operation of the joint venture." *Id.* ¶ 244. But there are no allegations that RelineEurope or Reline Management have ceased involvement with the management and operation of Reline America (in fact, the basis of *Reline 2* is their continued attempts to remain involved), and there are no allegations that APTEC and SML specifically made any assertions that they would remain involved in Reline America. Therefore, this claim fails.

Accordingly, the motions to dismiss the fraud claim against SML and APTEC will be granted, and the motion to dismiss the fraud claim against RelineEurope and Reline Management is denied as to the fraudulent concealment of products and technology claim asserted by Reline America and Reline Holdings and granted as to all other claims.

### d)    Civil Conspiracy (Count V)

To state a claim for civil conspiracy, a plaintiff must allege that there was "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or the use of such means to accomplish an act that is not necessarily illegal; and (3) actual legal damage."

*Tessemae's, LLC v. McDevitt*, Case No. 20-cv-2013-GLR, 2021 WL 1216669, at \*10 (D.

Md. Mar. 31, 2021) (citing *Van Royen v. Lacey*, 262 Md. 94, 97–98 (1971)). A civil

conspiracy may be established through circumstantial evidence, including "by inference

from the nature of the acts complained of, the individual and collective interest of the

alleged conspirators, the situation and relation of the parties at the time of the

commission of the acts, the motives which produced them, and all the surrounding

circumstances preceding and attending the culmination of the common design."

*Hoffman v. Stamper*, 385 Md. 1, 25–26 (2005). "The Fourth Circuit and the Maryland

Court of Appeals have held that a plaintiff cannot prevail on a claim for civil conspiracy

under Maryland law 'in the absence of other tortious injury to the plaintiff.'" *Brown v.

Bd. of Educ. of Prince George's Cnty., Maryland*, Case No. 20-cv-2632-DLB, 2022 WL

888424, at \*6 (D. Md. Mar. 25, 2022) (quoting *Marshall v. James B. Nutter & Co.*, 758

F.3d 537, 541 (4th Cir. 2014)); *see also Brown*, 2022 WL 888424, at \*6 ("[N]o action in

tort lies for conspiracy to do something unless the acts actually done, if done by one

person, would constitute a tort.") (quoting *Alleco Inc. v. Harry & Jeanette Weinberg

Found.*, 340 Md. 176, 190 (1995)).

    *Reline 1* Plaintiffs do not state the underlying tort on which the civil conspiracy

claim is based, but the claim alleges misrepresentations and concealment; therefore, the

Court will construe the claim as a civil conspiracy to commit fraud. *Reline 1*, ECF No. 73

¶¶ 254–257; *see Tessemae's, LLC*, 2021 WL 1216669, at \*10. "Claims of conspiracy to

commit fraud must abide by Rule 9(b)'s particularity requirements." *Hill v. Brush

Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 823 (D. Md. 2005) (citing *Adams*, 193

F.R.D. at 250); *see also Tessemae's, LLC*, 2021 WL 1216669, at \*10. Given the doctrine

of intracorporate immunity, a conspiracy between a corporation and the agents of that

corporation is a legal impossibility. *Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 238 (W.D. Va. 1988) (citing *Griffith v. Electrolux Corp.*, 454 F. Supp. 29, 32 (E.D.Va. 1978)).

For the same reasons *Reline 1* Plaintiffs failed to state a particularized claim of fraud against Noll, Flossmann, Allmann, APTEC, and SML, *see* § III.A.3.c, *infra*, the civil conspiracy claims against Noll, Flossmann, Allmann, APTEC, and SML will be dismissed. Similarly, for the same reasons Sugarloaf and Year 2003 Trust fail to state a particularized claim of fraud, *see* § III.A.3.c.ii, *infra*, the civil conspiracy claims alleged by them will be dismissed.

Although one of the fraud claims alleged against Reline Management and RelineEurope will proceed to discovery, the civil conspiracy claim must fail. Under the intracorporate conspiracy doctrine, a principal and its agents cannot conspire with one another, absent a pertinent exception. *See Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 567–68 (D. Md. 2014) (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)). "A parent and its wholly owned subsidiary have a complete unity of interest." *Copperweld*, 467 U.S. at 771. Therefore, "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise." *Id*. As Reline Management is the wholly owned subsidiary of RelineEurope, no other tort has been plausibly alleged against any other *Reline 1* defendant, and *Reline 1* Plaintiffs do not allege that any exception to the intracorporate conspiracy doctrine applies, the civil conspiracy claim against Reline Management and RelineEurope will be dismissed.

B.    *Reline 2*

    1.    **Whether the claims in *Reline 2* constitute compulsory counterclaims with respect to *Reline 1***

"A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1) (defining "compulsory counterclaims"). The compulsory counterclaims rule "was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters." *Southern Constr. Co., Inc. v. Pickard*, 371 U.S. 57, 60 (1962). "Neither the Supreme Court nor the Fourth Circuit has explicitly required that the prior action must be resolved for Rule 13(a) to bar the claims in the latter case. Given that the 'very purpose of making certain types of counterclaims compulsory is to prevent the relitigation of the same set of facts[,]' it would be logical to infer that simultaneous litigation of the same set of facts should be avoided as well." *Aaron Fine Arts v. O'Brien*, 244 F.R.D. 294, 296–97 (D. Md. 2007) (citing *Painter v. Harvey*, 863 F.2d 329, 332 (4th Cir. 1988)).

Reline Holdings, Reline America, Pleasants Enterprises, Pleasants Companies, and Pleasants contend that the Court should not consider the merits of *Reline 2* as all the claims alleged are compulsory counterclaims to *Reline 1* and thus *Reline 2* should be dismissed. *Reline 2*, ECF No. 15 at 17–26. But "Rule 13(a) does not come into play when a defendant files only a motion to dismiss, instead of a pleading." *Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 795 (4th Cir. 1993) (collecting cases). As *Reline 2* Plaintiffs have filed only a motion to dismiss in *Reline 1* and not a pleading, *see Reline 1*, ECF No. 79,

65

Rule 13(a) has not yet come into play and, therefore, the Court will not dismiss *Reline 2* on that basis. Given their filing of a motion to dismiss all claims in *Reline 1* against them, even assuming that the claims in *Reline 2* would constitute compulsory counterclaims, *Reline 2* Plaintiffs had the right to file a separate lawsuit to preserve their claims from any statute of limitations until the motions to dismiss in *Reline 1* had been resolved.

In any event, given that some of the claims in both *Reline 1* and *Reline 2* will remain following the Court's Order, the Court will conduct the Rule 13 analysis to determine how pleadings should proceed going forward in these cases. Despite the fact that the Definitive Agreements are central to the issues in both cases and some of the parties overlap between the two cases, the Court finds that the primary factual issues to be determined in each case are sufficiently different such that the claims in *Reline 2* would constitute permissive rather than compulsory counterclaims to *Reline 1*. Therefore, *Reline 2* Plaintiffs may, but are not required to, file the surviving claims as counterclaims in *Reline 1* or maintain a separate case (with aligned discovery deadlines).

### a)      Rule 13(a)

To determine whether a claim is a compulsory counterclaim, the Fourth Circuit applies a four-factor test: "(1) Are the issues of fact and law raised in the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? and (4) Is there any logical relationship between the claim and counterclaim?" *Painter*, 863 F.2d at 331 (citing *Sue & Sam Mfg. Co. v. B–L–S Const. Co.,* 538 F.2d 1048, 1051–53 (4th Cir. 1976)). "A court need not answer all these questions in the affirmative for the

66

counterclaim to be compulsory. Rather, the tests are less a litmus, more a guideline." *Id.* (citing *Sue & Sam Mfg.*, 538 F.2d at 1053; *Hosp. Bldg. Co. v. The Tr. of Rex Hosp.*, 86 F.R.D. 694, 696 (E.D.N.C. 1980)).

### i.    Factors 1 & 3

Factors one and three of the *Painter* test can overlap such that both are "satisfied where '[a] primary factual issue . . . will be the nature of the business transactions between the parties.'" *Harrison v. Grass*, 304 F. Supp. 2d 710, 714 (D. Md. 2004) (quoting *Banner Indus. of N.Y., Inc. v. Sansom*, 830 F. Supp. 325, 327 (S.D. W. Va. 1993)). "[T]he Supreme Court has emphasized that the word 'transaction' has a flexible meaning which may include a series of many occurrences that depend not so much on the immediateness of their connection, but upon their logical relationship." *Id.* (quoting *Hosp. Bldg.*, 86 F.R.D. at 695-96; citing *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593 (1926)) (internal quotations omitted). "[I]f essential facts alleged by one party enter into and constitute a part of the cause of action set forth in the opposing party's counterclaim, that counterclaim is compulsory even though it may not be precisely identical to the federal cause of action and even though the counterclaim embraces additional allegations." *Id.* (quoting *Hosp. Bldg.*, 86 F.R.D. at 695-96) (internal quotations omitted). "The third factor, while not itself dispositive, is the most probative, for if 'the same evidence will support or refute both the claim and the counterclaim, the counterclaim will almost always be compulsory.'" *Casero v. McNulty*, Case No. 17-cv-2205-SAG, 2019 WL 5309601, at *5 (D. Md. Oct. 21, 2019) (quoting *Long v. Welch & Rushe, Inc.*, 28 F. Supp. 3d 446, 452 (D. Md. 2014)).

While it is true that the two plaintiffs in *Reline 2* are defendants in *Reline 1* and that three of the five defendants in *Reline 2* are plaintiffs in *Reline 1*, the only

67

evidentiary overlap between the two cases appears to be the existence of the Definitive Agreements. While both cases include breach of contract claims relating to those Definitive Agreements, the claims relate to different provisions of the agreements and relate to alleged breaches occurring in different years. *Reline 1* primarily relates to facts alleged to have occurred between 2018 and 2019, while *Reline 2* relates to facts alleged to have occurred between 2020 and 2023.

### ii.    Factor 2

Both *Reline 1* and *Reline 2* invoke the Court's diversity jurisdiction, and thus Maryland res judicata law governs. *See Q Intern. Courtier Inc. v. Smoak*, 441 F.3d 214, 218 (4th Cir. 2006). "Under Maryland law, the doctrine of res judicata, or claim preclusion, bars the relitigation of a claim if (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the subsequent action is "identical to that determined or that which could have been raised and determined in the prior litigation"; and (3) there was a final judgment on the merits in the prior litigation." *Williams v. Long*, 558 F. Supp. 2d 601, 605 (D. Md. 2008) (citing *R & D 2001 LLC v. Rice,* 402 Md. 648, 663 (2008)).

As stated above, the claims in *Reline 1* and *Reline 2* relate to different provisions within the Definitive Agreement and relate to breaches occurring in different years. Accordingly, the claims in *Reline 2* cannot be said to be "identical" to those that would be determined in *Reline 1*. And there has been no final judgment on the merits of *Reline 1*. Therefore, res judicata does not bar the claims in *Reline 2*.

### iii.    Factor 4

"When the same contract serves as the basis for both the claims and the counterclaims, the logical relationship standard [] has been satisfied." *Chelsea House N.*

*Apartments, LLC v. Blonder*, 223 F.R.D. 388, 391, n.4 (D. Md. 2004) (quoting 6 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1410, 67–68 (3d ed. 1998)) (internal quotations omitted). In *Banner Indus.*, the court "conclud[ed] that a logical relationship existed where both sets of claims arose 'from the souring of [the parties'] business relationship' and allowing separate proceedings 'would result not only in duplication of evidence and effort but also wasted judicial resources.'" *Harrison*, 304 F. Supp. 2d at 715 (quoting *Banner Indus.*, 830 F. Supp. at 328). However, in *Whigham v. Beneficial Finance Co. of Fayetteville, Inc.*, the Fourth Circuit held that no logical relationship existed where two actions involved the same loan but where the borrower's claim was under the Truth-in-Lending Act and the lender's claim was for the debt owed by the borrower. 599 F.2d 1322, 1324 (4th Cir. 1979) ("The borrower's federal claim involves the same loan, but it does not arise from the obligations created by the contractual transaction.").

While some logical relationship exists between *Reline 1* and *Reline 2* as they both arise from a disagreement stemming from the sale of RelineEurope to Bregal and Pipe Holdings, the claims themselves arise out of different obligations under the Definitive Agreements similar to *Whigham*. To the extent that any concern regarding duplication of effort or judicial resources exists, this is mitigated by the fact that the same judge is presiding over both cases and can issue joint opinions and orders such as this one.

### b)   Rule 13(b)

As the Court has found that Rule 13(a) does not apply to *Reline 2*, the Court turns to Rule 13(b). Under Rule 13(b), "[a] pleading may state as a counterclaim against an opposing party any claim that is not compulsory." Fed. R. Civ. P. 13(b) (defining "permissive counterclaim"). Because *Reline 2* constitutes a permissive rather than

compulsory counterclaim, the Court will provide *Reline 2* Plaintiffs an opportunity to make that determination as to whether to file the surviving *Reline 2* claims as counterclaims to *Reline 1* prior to requiring a responsive pleading in *Reline 2*.

### 2.    Failure to State a Claim

#### a)    Breach of Contract Claims (Counts I–III)[9]

##### i.    Breach of Major Decisions Provision

The Operating Agreement provides that certain major decisions for Reline America would "require the affirmative vote of the Required Majority of Members." *Reline 1*, ECF No. 79-2 at 13, Operating Agreement Art. VI, Sec. 6.03(B). The applicable decisions include "[a]ny expenditures or investment, outside the approved budget, in amounts equal to or greater than $500,000.00 or more in each individual case." *Id.*, Operating Agreement Art. VI, Sec. 6.03(B)(iii).

##### I.    Management Fees (Count I)

Reline Management contends that the "Major Decisions" provision was materially breached based on its discovery that "Management Fees" in excess of $500,000 were incurred in 2020, 2021, and 2022 that neither appeared on the annual budgets nor were approved by Reline Management. *Reline 2*, ECF No. 1 ¶ 102. Specifically, they allege that Reline America incurred Management Fees in the amount of $539,988.63 in 2020, $622,258.88 in 2021, and $535,631.17 in 2022. *Id.* ¶ 82.

Reline Holdings argues that Reline Management fails to state a claim for three reasons: (1) the Major Decisions provision only prevents an expenditure of greater than $500,000 **in an individual case** rather than the annual total; (2) the Operating

---

[9] The legal standards for breach of contract claims can be found in § III.A.3.a., *infra.*

Agreement specifically provides for the Manager to have the authority to determine management fees to be paid; and (3) Reline Holdings would have had no way of knowing the exact total for management fees in order to include it in the annual budget. *Reline 2*, ECF No. 15 at 29–31.

As to Reline Holdings's first argument, it points to the language in the Major Decisions provision, which requires a unanimous affirmative vote for "[a]ny expenditures . . . in amounts equal to or greater than $500,000.00 or more *in each individual case*." *Id*. at 29 (citing *Reline 1*, ECF No. 79-2 at 13, Operating Agreement Art. VI, Sec. 6.03(B)(iii)). It contends that, because Reline Management acknowledges that the management fees were paid on a monthly basis of approximately $45,000 per month rather than as a lump sum payment, Reline Management is trying to expand the application of the Major Decisions Provision to expenditures with an *annual total* of more than $500,000, which contradicts the clear language of the text. *Id*. at 29–31.

Reline Management argues that Reline Holdings's interpretation is inconsistent with the plain language of the provision as it relates to annual payments of $500,000 or more, that Reline Holdings's interpretation would lead to an absurd result where "Reline Holdings could authorize daily payments of $490,000 into the account of Pleasants-controlled entities without including that amount in the annual budget or obtaining Reline Management's approval," to the extent that any ambiguity exists in the interpretation of the provision, that is a factual issue not ripe for a motion to dismiss determination, and the complaint does not allege that the 2022–2022 management fee payments were paid on a monthly basis, only the 2023 fees for which the invoices were likely created in anticipation of litigation. *Reline 2*, ECF No. 20-1 at 29–30.

For now, Reline Holdings's first argument fails as Reline Management has sufficiently stated a claim that the management fees paid in 2020, 2021, and 2022 were greater than $500,000 and did not appear on the annual budget and were not approved by Reline Management. Additionally, the complaint alleges only that invoices for June 2023 through October 2023 indicated that the management fees were paid in amounts of approximately $45,000 per month. *See Reline 2*, ECF No. 1 ¶ 91. Nothing in the complaint indicates that the 2020–2022 payments were also made on a monthly basis rather than annual. Based on the plain language of the Operating Agreement, the provision requiring a unanimous vote would only apply where a single expenditure exceeds $500,000 in a single case rather than a collection of line items paid to multiple entities or people over multiple months that total more than $500,000. Accordingly, if the management fee payments between 2020 and 2022 are found to have been made in multiple expenditures of less than $500,000, then this claim will fail. But, as the pleadings currently do not specify the form in which the 2020–2022 payments were made, Reline Holdings's first argument fails.

As to Reline Holdings's second argument, it points to another section of the Operating Agreement, which provides that "Members and/or Affiliates may not be entitled to the payment of . . . management fees . . . for services rendered for and on behalf of the Company except as reasonably determined by the Manager. Any change in the amount of fees or compensation shall be reasonably determined by the Manager." *Reline 2*, ECF No. 15 at 30 (citing *Reline 1*, ECF No. 79-2 at 18, Operating Agreement Art. VIII, Sec. 8.03). It, thus, contends that, as the Manager of Reline America, Reline Holdings had the power to reasonably determine the management fees to be paid to Affiliates such as Pleasants Enterprises. *Id.* at 31. Additionally, Reline Holding notes

72

that Reline Management does not allege anything regarding the fairness, reasonableness, or necessity of the management fees paid to state a claim under Section 8.03 of the Operating Agreement either. *Id.* While this argument may ultimately prevail, this is factual issue for which discovery is necessary to determine to whom payments were made and the fairness and reasonableness of any payments. Accordingly, the Court will reject Reline Holdings's argument for purposes of the current motions.

Finally, Reline Holdings contends that, even taking Reline Management's contentions as true, Reline Holdings would have had no way of knowing the exact costs of management fees at the beginning of each year in order to include it in the budget as these were not individual expenditures of greater than $500,000. *Id.* at 32. Like the first argument regarding how the management fee payments were made in 2020–2022, discovery is necessary to resolve this claim too. For these reasons, Reline Holdings's motion to dismiss Count I of *Reline 2* will be denied.

## II.   Lawsuit (Count II)

Reline Management contends that the initiation of the *Reline 1* lawsuit without a unanimous affirmative vote by the Members was a breach of the Major Decisions provision as *Reline 1* would require Reline America to expend more than $500,000 in legal fees that were not accounted for in the annual budget. *Reline 2*, ECF No. 1 ¶¶ 94–98, 108.

Reline Holdings argues that this claim must be dismissed because there is no allegation that there has actually been a litigation-related expenditure that has exceeded $500,000 and that Reline Management's information and belief that attorneys' fees would exceed $500,000 is entirely speculative. *Reline 2*, ECF No. 15 at 33. Reline Holdings also argues that "this cause of action shows how illogical [Reline

Management's] 'interpretation' of § 6.03 is" because "[b]y their interpretation, any time members have a guess that something may *eventually* cost more than $500,000—even if it takes several years to total that amount—they are required to hold a vote approving it." *Id.* (emphasis in original).

Reline Management contends that its assertion that litigation costs would exceed $500,000 is not entirely speculative as it has identified the bases for the inference such as the time and cost to serve international defendants. *Reline 2,* ECF No. 20-1 at 32. Additionally, they argue that Reline Holdings is "severely overstating the burden of requiring Reline America's *two members* to vote on certain 'Major Decisions.'" *Id.* (emphasis in original).

As stated above, the plain language of Section 6.03(B) of the Operating Agreement requires a unanimous affirmative vote only for singular expenditures of greater than $500,000 **in each individual case**. Reline Management has not alleged that Reline America has paid an expense of greater than $500,000 in the litigation of *Reline 1*. Further Reline Management has failed to allege any facts to support the contention that Reline America, rather than Reline Holdings, Pleasants Enterprises, Pleasants Companies, or Pleasants, is paying the entire litigation bill. Given that the Operating Agreement only applies to expenditures by Reline America, Reline Management has failed to allege facts to support a claim that a breach has occurred. Therefore, this claim will be dismissed.

### ii. Breach of Financial Records Provision (Count III)

The Operating Agreement further provides that "[a]s soon as practicable after the end of each calendar quarter, the Manager shall deliver to each Member an unaudited

financial statement of the Company including balance sheet and statement of revenues and expenses. As soon as practicable after the end of each fiscal year, the Manager shall deliver to each Member a report of the financial condition of the Company." *Reline 1*, ECF No. 79-2 at 20, Operating Agreement Art. XI, Sec. 11.01. Additionally, "Members or their authorized representatives shall be permitted access to all records of the Company after adequate notice at any reasonable time during the Company's normal business hours"; "[e]ach Member has the right to request an audit of the Company's books and records (including financial statements and accounting records)"; and "[t]he Company and its employees shall reasonably cooperate with respect to any such audit." *Id*. at Art. XI, Sec. 11.03(A)–(B).

Reline Management contends that Reline Holdings and Reline America breached this provision by refusing to provide Reline Management with required books and records or cooperate with their requested audit, which was sent on January 24, 2023. *Reline 2*, ECF No. 1 ¶ 114. Reline Holdings and Reline America argue that the facts in the complaint showed that they did comply with that provision as Reline Holdings provided preliminary and secondary productions of documents in February and November 2023 and, although Reline Management asserts that these productions were "incomplete," they do not allege what it contends to be missing from these productions. *Reline 2*, ECF No. 15 at 35. Additionally, during the February 9, 2026 hearing, Reline Holdings and Reline America contended that the Operating Agreement does not require them to email documents to Reline Management but rather just make them available to view in the Reline America office.

Reline Management sufficiently alleges that it made two formal requests for books and records, that Reline Holdings and Reline America produced two sets of

documents months after the requests, and that Reline Management notified them that these productions were incomplete but complete productions were never provided. Reline Management specifically noted two requests to which Reline America did not object but for which it has yet to provide documentation. *Reline 2*, ECF No. 1 ¶¶ 86–87. Further, Reline Management sufficiently states a claim that an eleven-month delay in production is unlikely to constitute the level of access to financial records provided for in the Operating Agreement. Therefore, Reline Holdings and Reline America's motion to dismiss Count III will be denied as to Reline Management.

### iii.   Damages for Breach of Contract Claims

In the complaint, *Reline 2* Plaintiffs state that they seek punitive damages as to the breach of contract claims. *See Reline 2*, ECF No. 1 ¶¶ 104, 110. Punitive damages are generally not available for a breach of contract claim under Maryland law. *KVC Waffles Ltd. v. New Carbon Company, LLC.*, Case No. 20-cv-195-GLR, 2020 WL 6204303, at *6 (D. Md. Oct. 22, 2020); *Schaefer v. Aetna Life & Cas. Co.*, 910 F. Supp. 1095, 1099 (D. Md. 1996) (citing *Johnson v. Federal Kemper Insurance*, 74 Md. App. 243, 249 , *cert. denied*, 313 Md. 8, 542 A.2d 844 (1988)). During the February 9, 2026 hearing, *Reline 2* Plaintiffs conceded that punitive damages are not available for their breach of contract claims. Accordingly, *Reline 2* Plaintiffs' requests for punitive damages for the breach of contract claims will be dismissed.

### b)   Breach of Fiduciary Duties (Count VI)[10]

Reline Holdings's motion to dismiss broadly requests dismissal of all claims in *Reline 2* but does not specifically dispute Reline Management's claim of breach of

---

[10] The legal standards for Breach of Fiduciary Duties can be found in § III.A.3.b., *infra*.

fiduciary duty against Reline Holdings on the merits. *See Reline 2*, ECF No. 15 (only mentioning the claim to the extent Reline Holdings argues it should have been brought as a compulsory counterclaim). Despite Reline Management pointing this out in the response brief, *see Reline 2*, ECF No. 20-1 at 33, Reline Holdings did not specifically dispute this claim in their reply brief either, *see Reline 2*, ECF No. 22. Given that managing members, such as Reline Holdings, owe a fiduciary duty to the LLC and other members, such as Reline Management, Reline Management has sufficiently alleged that there was a fiduciary relationship. *See Plank*, 469 Md. at 571–72. Reline Management's complaint sufficiently alleges various breaches of this fiduciary duty and their alleged harm. *Reline 2*, ECF No. 1 ¶¶ 132–133. Accordingly, to the extent Reline Holdings seeks dismissal of the breach of fiduciary duty claim, the motion will be denied.

### c)      Fraudulent Concealment (Count VII)[11]

*Reline 2* Plaintiffs contend that Reline Holdings, Reline America, Pleasants Enterprises, Pleasants Companies, and Pleasants fraudulently concealed the allegedly unauthorized management fee payments by not including them in the annual budget, not requesting Reline Management's consent before incurring these fees, by refusing to produce Reline America's books and records when requested, and hiding the rows in the spreadsheets with the fee information. *Reline 2*, ECF No. 1 ¶¶ 82, 137, 139. They contend that Reline America, Reline Holdings (as manager of Reline America), Pleasants Enterprises (as manager of Reline Holdings), Pleasants Companies (as an affiliate of Pleasants and the recipient of the alleged unjust benefit), and Pleasants (as signatory on behalf of Reline America and President of Pleasants Enterprises and Reline Holdings)

---

[11] The legal standards for fraud pleading and fraudulent concealment can be found in § III.A.3.c., *infra*.

owed a duty to disclose this information to *Reline 2* Plaintiffs. *Id.* ¶ 136. *Reline 2* Plaintiffs contend that they relied on the belief that expenditures greater than $500,000 on behalf of Reline America would not be incurred without Reline Management's approval and that they would not have authorized these payments if they had been informed. *Id.* ¶¶ 138, 140.

### i.   Duty

*Reline 2* Defendants argue that *Reline 2* Plaintiffs failed to allege that they owed any obligation to disclose the payment of the management fees to *Reline 2* Plaintiffs. *Reline 2*, ECF No. 15 at 39. *Reline 2* Plaintiffs argue that they have sufficiently pled that Reline Holdings owed a fiduciary duty to Reline Management as the managing member of the LLC and therefore had a duty to disclose information to Reline Management. *Reline 2*, ECF No. 20-1 at 35 (citing *Plank*, 469 Md. at 572). They argue that, in any event, *Reline 2* Defendants took on a duty to disclose by selectively disclosing certain financial information while hiding other material information. *Id.* at 36.

*Reline 2* Plaintiffs have sufficiently alleged that Reline America and Reline Holdings owed them a duty to disclose both based on the alleged fiduciary relationship and based on the alleged partial disclosure of financial information while hiding other material information. *Reline 2* Plaintiffs have not, however, sufficiently alleged that Pleasants Enterprises, Pleasants Companies, and Pleasants owed any duty to disclose financial information regarding Reline America. Accordingly, the fraudulent concealment claim fails as to Pleasants Enterprises, Pleasants Companies, and Pleasants for that reason.

### ii.    Failure to Disclose and Intent to Defraud

Reline America and Reline Holdings argue that the complaint fails to allege a failure to disclose as "Plaintiffs allege that they were unaware of the Management Fees until May 16, 2023 when they 'analyzed the hidden rows in spreadsheets that contained more than 600 rows that Reline America had provided.' [citing *Reline 2*, ECF No. 1 ¶ 82]. The Complaint does not allege when these spreadsheets had been provided to Plaintiffs or that the Defendants intentionally hid any rows in the spreadsheets." *Reline 2*, ECF No. 15 at 39. They further argue that "[t]he Complaint also does not allege—beyond mere conclusory allegations—that Defendants intended to defraud or deceive Plaintiffs." *Id.* at 40. *Reline 2* Plaintiffs argue that none of the financial reports received by Reline Management between 2020 and 2022 disclosed the management fees, which is sufficient to support a failure to disclose. *Reline 2*, ECF No. 20-1 at 37. They also note that "[g]eneral allegations of intent and knowledge suffice under FRCP 9(b)." *Id.* at 38 (citing *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 904 (D. Md. 2015)).

*Reline 2* Plaintiffs sufficiently allege that Reline America and Reline Holdings failed to disclose information regarding the management fees based on the allegations that they received weekly financial reports until June 2021 and yet they were not aware of these fees until May 2023. *See Reline 2*, ECF No. 1 ¶¶ 82, 84. Additionally, the complaint's general allegation of intent suffices for the pleading stage. *See id.* ¶ 139; *Pasternak & Fidis*, 95 F. Supp. 3d at 904.

### iii.    Reliance and damages

Finally, Reline America and Reline Holdings argue that the complaint does not allege that Reline Management took any action in justifiable reliance on the alleged

concealment. *Reline 2*, ECF No. 15 at 40. *Reline 2* Plaintiffs contend that "[w]hen Reline Management approved Reline America's budgets, it did so in reliance on the representation that Defendants had fully disclosed the material expenditures in those budgets." *Reline 2*, ECF No. 20-1 at 39. The complaint also alleges that had the management fees been presented for a members vote, Reline Management would not have approved them. *Reline 2*, ECF No. 1 ¶ 138.

    *Reline 2* Plaintiffs have adequately pled that they relied upon the lack of disclosure of their information and that this resulted in the damages alleged. Accordingly, the motion to dismiss the fraudulent concealment claims as to Reline Holding and Reline America will be denied.

### d)    Unfair Competition (Count VIII)

    "Under Maryland law, unfair competition is the 'damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort.'" *Pan 4 Am., LLC v. Tito & Tita Food Truck, LLC*, Case No. 21-cv-401-DLB, 2022 WL 622234, at *5 (D. Md. Mar. 3, 2022) (quoting *Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 406–407 (1999)).

> What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Id.* at *6 (quoting *Farm Fresh Direct Direct By a Cut Above LLC v. Downey*, Case No. 17-cv-1760-ELH, 2017 WL 4865481, at *10 (D. Md. Oct. 26, 2017)). Therefore, "[t]here are no specific elements required to establish unfair competition under Maryland law." *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 450 (D. Md. 2023) (quoting *LSR, Inc. v. Satellite Restaurants Inc. Crabcake Factory USA*, Case No. 17-cv-

03722-SAG, 2020 WL 4903902, at *6 (D. Md. Aug. 20, 2020)) (internal quotations omitted). However, a plaintiff must allege an intentional act to sustain an unfair competition claim. *See Monumental Life Ins. Co. v. U.S. Fid. & Guar. Co.,* 94 Md. App. 505, 534 (1993). "The courts must be careful to guard against extending the meaning of 'unfair competition' to cover acts which may be unethical yet not illegal." *Edmonson Village Theatre, Inc. v. Einbinder*, 208 Md. 38, 48 (1955).

*Reline 2* Plaintiffs contend that *Reline 2* Defendants engaged in "fraud, deceit, trickery or unfair [business] methods" by incurring management fees in excess of $500,000 between 2020 and 2022 without Reline Management's approval and by enforcing a non-compete provision to prevent Reline Management from competing in the UV CIPP industry anywhere in the American Markets indefinitely. *Reline 2*, ECF No. 1 ¶¶ 144–146.

*Reline 2* Defendants argue that *Reline 2* Plaintiffs have failed to allege that they intentionally engaged in wrongful conduct as is required for this claim. *Reline 2*, ECF No. 15 at 41–42. First, they contend that the management fees were contemplated in the terms of the Operating Agreement and cannot rise to the level of intentional wrongdoing as "[s]imply because Plaintiffs have a different . . . interpretation of the Operating Agreement does not render Defendants' conduct wrongful, fraudulent, or deceitful so as to support an unfair competition claim." *Id*. Second, *Reline 2* Defendants argue that "Plaintiffs do not, and cannot, show how enforcement of an agreed-upon contractual term constitutes "wrongful conduct" necessary to sustain this claim." *Id*. at 43.

To the extent that *Reline 2* Plaintiffs contend that the management fees constitute unfair competition, that claim fails because *Reline 2* Plaintiffs have failed to plead how this alone would result in the "damaging or jeopardizing [of Reline

81

Management or RelineEurope]'s business." *Pan 4 Am.,* 2022 WL 622234, at *5. Taken as true, this clearly would have had an effect on Reline America's financials, but, as *Reline 2* Defendants point out, the payment of *some* management fees are contemplated in the Operating Agreement, and therefore, *Reline 2* Plaintiffs have failed to link this action to intentional wrongdoing that caused them direct harm. *See Reline 1*, ECF No. 79-2 at 18, Operating Agreement Art. VIII, Sec. 8.03. Also, to the extent that *Reline 2* Plaintiffs argue that the non-compete provisions are invalid and therefore it was unlawful for *Reline 2* Defendants to enforce it, the Court has already rejected this argument. *See* § III.A.3.a.iv.V., *infra.* Additionally, the enforcement of an agreed-upon provision does not constitute "fraud, deceit, trickery or unfair methods." *Pan 4 Am.,* 2022 WL 622234, at *5. *Reline 2* Plaintiffs bargained for this provision and in fact included a non-compete provision preventing Reline America from competing outside of the American Markets. *See Reline 1*, ECF No. 79-3 at 5, Cooperation Agreement Secs. 3 & 4. Accordingly, the unfair competition claim will be dismissed.

### C.      Dismissals

Because a court's dismissal of a case on jurisdictional grounds is not a determination of the merits and thus does not preclude the plaintiff from pursuing a claim in a court that does have proper jurisdiction, a dismissal for lack of personal jurisdiction must be without prejudice. *Hong Tang v. Univ. of Balt.*, 782 F. App'x 254, 256 (4th Cir. 2019) (citing *Ramming v. United States*, 281. F.3d 158, 161 (5th Cir. 2001)). In contrast, "[t]he determination [of] whether to dismiss with or without prejudice under Rule 12(b)(6) is within the discretion of the district court." *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638–39 (D. Md. 2009) (citing *Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985)). The policy of the Federal

82

Rules of Civil Procedure generally favors allowing the amending of pleadings particularly where minimal time had been spent or expense incurred as a result of the inadequate pleading and in the absence of bad faith. *Id.* at 639 (citing Fed. R. Civ. P. 15(a)).

Because the *Reline 1* claims against Bregal and Pipe Holdings are being dismissed on personal jurisdiction grounds, the dismissal of the claims against those parties is without prejudice.

With respect to the other claims that the Court is dismissing herein, the Court notes that this Memorandum Opinion is based on motions to dismiss the Third Amended Complaint in *Reline 1*, that three years have passed since the filing of the first complaint in *Reline 1*, and that the defendants in *Reline 1* have filed more than fifteen motions or briefs in response or reply to motions and have attended numerous hearings in this case. Thus, it is clear that substantial time has been spent as a result of *Reline 1* Plaintiffs' inadequate pleadings. Therefore, while the Rule 12(b)(6) dismissals in *Reline 1* and *Reline 2* will be deemed to be without prejudice, any motion for leave to file a fourth amended complaint in *Reline 1* will be evaluated in the light of these circumstances.

## IV. CONCLUSION

For the foregoing reasons, RelineEurope, APTEC, Reline Management, Bregal, and Pipe Holdings's motion to dismiss (*Reline 1*, ECF No. 79) will be granted in part and denied in part; Noll, Flossmann, Allmann, and SML's motion to dismiss (*Reline 1*, ECF No. 80) will be granted in part and denied in part; and Masek's motion to dismiss (*Reline 1*, ECF No. 89) will be granted. Additionally, *Reline 2* Defendants' motion to dismiss (*Reline 2*, ECF No. 15) will be granted in part and denied in part.

As such, the following claims remain for each of the cases.

*Reline 1* Claims:

| Claims | Plaintiffs | Defendants |
|---|---|---|
| Count I: Breach of Contract (Section 7.3 of the Undertaking Agreement ONLY) | Reline America | Noll, Flossmann, and Allmann |
| Count II: Breach of Contract (Additional Express Provisions) | (broken up into sub-counts below) | |
| Count II(a): Non-Compete Provisions | Reline America and Reline Holdings | Reline Management, RelineEurope, and APTEC |
| Count II(b): Cross-Licenses | Reline America and Reline Holdings | Reline Management, RelineEurope, and APTEC |
| Count II(c): Good Faith Provisions | Reline America and Reline Holdings | Reline Management, RelineEurope, APTEC, Noll, Flossmann, and Allmann |
| Count III: Breach of Fiduciary Duties | Reline America and Reline Holdings | Reline Management |
| Count IV: Fraud | Reline America and Reline Holdings | RelineEurope and Reline Management |

*Reline 2* Claims:

| Claim | Plaintiffs | Defendants |
|---|---|---|
| Count I: Breach of Contract (Management Fees) | Reline Management | Reline Holdings |
| Count III: Breach of Contract (Financial Records) | Reline Management | Reline Holdings and Reline America |
| Count VI: Breach of Fiduciary Duties | Reline Management | Reline Holdings |
| Count VII: Fraudulent Concealment | Reline Management and RelineEurope | Reline Holdings and Reline America |

A separate order follows.

Date: March 6, 2026

_____/s/_____
Adam B. Abelson
United States District Judge